CARA PETERSEN, DC Bar #476990
Deputy Enforcement Director for Litigation
(Phone: 202-435-9747)
JAN SINGELMANN, DC Bar # 999087
(E-mail: jan.singelmann@cfpb.gov)
(Phone: 202-435-9670)
AMY RADON, CA Bar # 277727
(E-mail: amy.radon@cfpb.gov)
(Phone: 202-435-9142)
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

KENT KAWAKAMI, CA Bar # 149803 – Local Counsel
(Phone: 213-894-4858)
(E-mail: Kent.Kawakami@usdoj.gov)
United States Attorney's Office
Central District of California - Civil Division
300 North Los Angeles Street, Room 7516
Los Angeles, CA 90012
Fax: (213) 894-2380

Attorneys for Plaintiff
Consumer Financial Protection Bureau

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>          Plaintiff,<br><br>          v.<br><br>Vincent Howard, Lawrence W. Williamson, Howard Law, P.C., The Williamson Law Firm, LLC, and Williamson & Howard, LLP,<br><br>          Defendants. | Case No. 8:17-CV-00161<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF** |

1

The Consumer Financial Protection Bureau (the "Bureau") alleges the following against Vincent Howard, Lawrence W. Williamson, Howard Law, P.C., The Williamson Law Firm, LLC, and Williamson & Howard, LLP (collectively, "Defendants"):

## INTRODUCTION

1. Defendants operate a debt relief scheme that collects exorbitant, illegal advance fees from vulnerable consumers suffering financial difficulties. Defendants solicit consumers with large debts, promising that Defendants' network of lawyers will negotiate affordable repayments with consumers' creditors.

2. Defendants have collected millions of dollars of unlawful fees from consumers before settling their debts—which Defendants often fail to settle at all.

3. The Bureau brings this action under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6102(c)(2), 6105(d); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. pt. 310; and Sections 1031(a), 1036(a)(1), 1054, and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a)(1), 5564, and 5581, in connection with the marketing and sale of debt relief services.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over this action because the action is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

5. This Court has personal jurisdiction over Defendants because the causes of action arise from Defendants' transacting business in this District or Defendants have caused injury in this District through acts or omissions occurring both inside and outside of this District.

6. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and 12 U.S.C. § 5564(f).

# PLAINTIFF

7. The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority, 12 U.S.C. § 5564(a)-(b), including the authority to enforce the TSR as it applies to persons subject to the CFPA, 15 U.S.C. §§ 6102(c)(2), 6105(d).

# DEFENDANT VINCENT HOWARD

8. Defendant Vincent Howard ("Howard") is an attorney licensed to practice in the State of California. Howard is the managing shareholder and President of Howard Law, P.C. ("Howard Law") and he is the managing partner and owns 50 percent of the Class A shares of Williamson & Howard, LLP ("Williamson & Howard").

9. At all times material to this complaint, acting alone or in concert with others, Defendant Howard has formulated, directed, controlled, or materially participated in the conduct of the affairs of Howard Law and Williamson & Howard.

10. Given his status as an officer or employee charged with managerial responsibility for Howard Law and Williamson & Howard, Defendant Howard is a "related person" under the CFPA. 12 U.S.C. § 5481(25). Because of his status as a "related person" under the CFPA, Howard is a "covered person" under the CFPA. *Id*.

11. Defendant Howard is also a "covered person" under the CFPA because he engages in the offering or provision of financial advisory services for use by consumers primarily for personal, family, or household purposes, including services to assist consumers settle debts. 12 U.S.C. §§ 5481(5), (6), and (15)(A)(viii).

12. At all times material to this Complaint, Defendant Howard has transacted business in the Central District of California.

# DEFENDANT LAWRENCE W. WILLIAMSON

13. Defendant Lawrence W. Williamson ("Williamson") is an attorney licensed to practice in the State of Kansas. Williamson is the Owner and Principal of The

Williamson Law Firm, LLC ("The Williamson Law Firm") and owns 50 percent of the Class A shares of Williamson & Howard.

14. At all times material to this complaint, acting alone or in concert with others, Defendant Williamson has formulated, directed, controlled, or materially participated in the conduct of the affairs of The Williamson Law Firm and Williamson & Howard.

15. Given his status as an officer or employee charged with managerial responsibility for The Williamson Law Firm and Williamson & Howard, Defendant Williamson is a "related person" under the CFPA. 12 U.S.C. § 5481(25). Because of his status as a "related person" under the CFPA, Williamson is a "covered person" under the CFPA. *Id*.

16. Defendant Williamson is also a "covered person" under the CFPA because he engages in the offering or provision of financial advisory services for use by consumers primarily for personal, family, or household purposes, including services to assist consumers settle debts. 12 U.S.C. §§ 5481(5), (6), and (15)(A)(viii).

17. At all times material to this Complaint, Defendant Williamson has transacted business in the Central District of California.

## DEFENDANT HOWARD LAW, P.C.

18. Defendant Howard Law, P.C. (f/k/a Howard |Nassiri, L.L.P. and Howard |Nassiri, P.C.) is a California professional corporation. Its physical business address is 2099 S. State College Blvd., # 360, Anaheim, CA 92806.

19. Defendant Howard Law offers and provides debt relief services, as defined in the TSR, 16 C.F.R. § 310.2(o), and financial advisory services within the meaning of the CFPA, 12 U.S.C. § 5481(15)(A)(viii).

20. Defendant Howard Law is a "covered person" under the CFPA because it engages in the offering or provision of financial advisory services for use by consumers primarily for personal, family, or household purposes, including services to assist consumers settle debts. 12 U.S.C. §§ 5481(5), (6), and (15)(A)(viii).

21. At all times material to this Complaint, Defendant Howard Law has transacted business in the Central District of California.

## DEFENDANT THE WILLIAMSON LAW FIRM, LLC

22. Defendant The Williamson Law Firm, LLC is a Kansas limited liability company. The address at which it was registered with the Kansas Secretary of State is 816 Ann Avenue, Kansas City, Kansas 66101.

23. Defendant The Williamson Law Firm offers and provides debt relief services, as defined in the TSR, 16 C.F.R. § 310.2(o), and financial advisory services within the meaning of the CFPA, 12 U.S.C. § 5481(15)(A)(viii).

24. Defendant The Williamson Law Firm is a "covered person" under the CFPA because it engages in the offering or provision of financial advisory services for use by consumers primarily for personal, family, or household purposes, including services to assist consumers settle debts. 12 U.S.C. §§ 5481(5), (6), and (15)(A)(viii).

25. Until at least June 2015, Defendant The Williamson Law Firm transacted business in the Central District of California.

## DEFENDANT WILLIAMSON & HOWARD, LLP

26. Defendant Williamson & Howard, LLP ("Williamson & Howard") is a California limited liability partnership. Its physical business address is 7545 Irvine Center Dr., #200, Irvine, CA 92618.

27. Defendant Williamson & Howard offers and provides debt relief services, as defined in the TSR, 16 C.F.R. § 310.2(o), and financial advisory services within the meaning of the CFPA, 12 U.S.C. § 5481(15)(A)(viii).

28. Defendant Williamson & Howard is a "covered person" under the CFPA because it engages in the offering or provision of financial advisory services for use by consumers primarily for personal, family, or household purposes, including services to assist consumers settle debts. 12 U.S.C. §§ 5481(5), (6), and (15)(A)(viii).

29. At all times material to this Complaint, Defendant Williamson & Howard has transacted business in the Central District of California.

## COMMON ENTERPRISE

30. At all times material to this complaint, Defendants have operated as a common enterprise while engaging in the violations of Federal consumer financial law set forth below. Defendants have conducted the business practices described below through an interrelated network of companies that have common business functions, employees, and office locations. Moreover, Defendants have also commingled funds and shared operations and proceeds of the unlawful activity. Because Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

## FACTUAL BACKGROUND

### *Creating the Debt Relief Scheme*

31. Defendants' unlawful scheme originated in 2007, when Vincent Howard and Lawrence Williamson aligned themselves with a company called Morgan Drexen, Inc. ("Morgan Drexen") to offer debt relief services.

32. To consummate the business arrangement, Howard moved Howard Law into Morgan Drexen's offices. Howard and Williamson also developed intake procedures, contracts, document templates, and other components of their debt relief program that were integrated into Morgan Drexen's computer platform.

33. Under the debt relief program that Howard and Williamson established, consumers would sign a contract for debt relief services with Howard Law or The Williamson Law Firm. The debt relief contract required consumers to pay advance fees prior to the settlement of any debt.

34. Although consumers entered into contracts with Howard Law or The Williamson Law Firm, Morgan Drexen conducted nearly all of the debt relief work. Among other things, Morgan Drexen:

- Produced and ran advertising, including on television and radio, throughout the country for the debt relief program;
- Answered the telephone calls from consumers throughout the country, who called in response to these advertisements;
- Enrolled consumers into the debt relief program on behalf of Howard, Williamson, and other attorneys;
- Negotiated with consumers' creditors; and
- Collected the fees from consumers on behalf of Howard and Williamson, and paid itself out of these fees.

35. To expand the scope of their debt relief program, Howard developed a network of associate attorneys, which grew to approximately 100 attorneys. Howard considered these attorneys "of counsel" to his firms and used them to offer debt relief services to consumers who resided in states where Howard was not licensed to practice law.

### *The TSR Amendments of 2010*

36. In October 2010, the FTC responded to the proliferation of abusive and deceptive practices in the debt relief industry by amending the TSR to, among other things, prohibit debt relief companies engaged in telemarketing from requesting or receiving advance fees before renegotiating, settling, reducing, or otherwise altering the terms of at least one of a consumer's debts, and before a consumer has made at least one payment on such altered debt. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B). In addition, if a debt is renegotiated, settled, reduced, or otherwise altered, the TSR requires that the fee for settling that debt must either be proportional to the total fee for renegotiating, settling, reducing, or altering the terms of a consumer's entire debt balance or be calculated as a flat percentage of the amount saved as a result of the negotiation, settlement, reduction, or alteration. 16 C.F.R. § 310.4(a)(5)(i)(C).

37. The TSR amendments do not provide an exemption for attorneys practicing law in connection with debt relief. The TSR amendments also do not exempt inbound consumer calls in response to advertisements relating to debt relief services. 16 C.F.R. § 310.6(b)(5)(i).

38. After the TSR was amended, but before its effective date of October 27, 2010, Howard, Williamson, Howard Law, and The Williamson Law Firm, along with Morgan Drexen, changed the debt relief program enrollment process. Instead of presenting the consumer with one contract for debt relief services, Howard, Williamson, Howard Law, and The Williamson Law Firm designed two different contracts for consumers to sign: one which was labeled as being for debt relief services and one which was labeled as being for bankruptcy-related services.

39. In 2013, Howard and Williamson formed Williamson & Howard to offer debt relief services in addition to their existing law firms.

40. Defendants had consumers sign two contracts to enroll in the debt relief scheme instead of one in order create the façade that Defendants were complying with the TSR by not charging unlawful fees for debt relief services. In fact, Defendants continued to charge consumers who sought debt relief services an advance engagement fee of between $1,000 and $3,250 and a monthly "administrative" fee of $50 in connection with debt relief services—they just moved every mention of these fees to the contract for bankruptcy-related services. The contract for debt relief services did not itself include any provisions relating to the payment of those fees.

41. In short, this two-contract debt relief model was designed by Howard, Williamson, Howard Law, and The Williamson Law Firm to disguise consumers' payments of unlawful fees for debt relief services as payments for sham bankruptcy-related services that consumers neither wanted nor needed.

### *The Enrollment Process for the Debt Relief Program*

42. To entice consumers to enroll into this unlawful debt relief scheme, Defendants marketed the program through television commercials, radio advertisements, and the internet.

43. While Morgan Drexen developed the initial draft of advertisements, Howard had final approval over all advertisements, including the content of the advertisement and whether the advertisement was aired.

44. From December 8, 2010, through April 11, 2014, television commercials advertising Defendants' debt relief program appeared on network and cable television on local and national stations across the country. The commercials contained messages that encouraged consumers to call Morgan Drexen immediately to take advantage of a limited opportunity.

45. The commercials claimed that the attorneys could help consumers eliminate their debt, and explicitly stated that the advertised services did not require payment of advance fees.

46. In many commercials, the words "$0 up-front fees" were displayed on the screen in large bold neon print, while a voice in the background announced, "Best part – no up-front fees. You have nothing to lose except your debt."

47. The commercials also explicitly advertised the debt relief program as a way for consumers to avoid bankruptcy, with statements such as: "Start your life over without filing bankruptcy."

48. Consumers responded to the advertisements by calling a toll-free number displayed in the advertisement, which would connect them to "Intake Specialists" employed by Morgan Drexen. Howard trained and supervised the Intake Specialists.

49. The Intake Specialists served two purposes. First, the Intake Specialists convinced consumers to enroll in the debt relief scheme by telling them that the attorneys

would negotiate with the consumer's creditors so that the consumer would be able to repay his or her unsecured debts for less than what was owed.

50.  Second, the Intake Specialists guided consumers through the enrollment process to ensure that they signed two contracts when enrolling in the debt relief scheme: one for debt relief services and one for sham bankruptcy services. Both contracts spanned four to five pages each, and were filled with legalese written in small font that appeared in single-spaced form. Upon signing the contracts, Defendants began making automatic monthly ACH withdrawals from the consumer's bank account, which Defendants first applied to the advance engagement fee and monthly servicing fee.

51.  Most consumers did not contact Intake Specialists for the purpose of seeking bankruptcy services and most did not understand or appreciate the difference between the contract for bankruptcy services and the contract for debt relief services.

52.  On occasions where the consumer did question the reason for the two separate contracts, the Intake Specialists engaged in widespread misrepresentations about the nature and purpose of the contracts. Among other things, the Intake Specialists represented that: consumers were required to fill out all bankruptcy-related paperwork as a condition of enrolling in the debt relief program; no bankruptcy work would occur unless and until the consumer explicitly stated that he or she wanted to file for bankruptcy; and consumers would not be charged fees for any bankruptcy-related services unless and until the consumer explicitly stated that he or she wanted to file for bankruptcy.

53.  Intake Specialists were under enormous pressure from Defendants and Morgan Drexen to ensure that consumers signed both contracts as a condition of enrolling in the debt relief scheme. The Intake Specialists worked in a fear-based, boiler-room environment where they were reprimanded and/or fired for failing to meet weekly enrollment quotas. The reason for the pressure was to ensure that Defendants and Morgan

Drexen could create a pretext—the sham bankruptcy services—to purportedly justify charging the consumer unlawful fees as part of the debt relief scheme.

### *Defendants' Receipt of Unlawful Fees*

54. After a consumer enrolled in the debt relief scheme, Defendants immediately began making automatic monthly withdrawals from the consumer's bank account.

55. With limited exception, it was not until the consumer's payments had covered the advance fees due under the contract for sham bankruptcy services—which often took a number of months—that the consumer's monthly payments were placed into a trust account to be used toward settlements with creditors.

56. Defendants also required consumers to pay fees that were neither proportional to the amount of any debts that were renegotiated nor calculated at a flat percentage rate of any amount saved as a result of the renegotiation.

57. When consumers sought to terminate their relationship with Defendants and obtain a refund of the money they paid, they typically were unable to do so, or they obtained only a partial refund. Defendants routinely argued that the fee payments were nonrefundable, regardless of whether they obtained any settlements for the consumer.

58. In total, thousands of consumers paid Defendants tens of millions of dollars in unlawful fees after enrolling in the debt relief scheme.

### *The Morgan Drexen Litigation*

59. On August 20, 2013, the Bureau filed suit against Morgan Drexen and its founder and CEO, Walter Ledda. The Bureau alleged, among other things, that Morgan Drexen and Ledda violated the TSR and the CFPA for their roles in: (1) requesting or receiving advance fees for debt relief services; and (2) representing to consumers that they would not be charged advance fees for debt relief services, when in fact, consumers were charged such fees.

60. Morgan Drexen's and Ledda's defense to the Bureau's lawsuit was that the advance fees consumers paid were not for debt relief services, but were instead for the

purported bankruptcy services described in the bankruptcy contracts that consumers signed. As part of their defense, Morgan Drexen and Ledda submitted sworn statements from Howard that the advance fees consumers paid were for bankruptcy petitions that Morgan Drexen prepared immediately upon a consumer's enrollment in the debt relief program. Morgan Drexen and Ledda attempted to bolster their defense by producing to the Bureau 400 client files, each of which contained a bankruptcy petition that—according to Morgan Drexen and Ledda—demonstrated they were actually performing bankruptcy work.

61. The case against Morgan Drexen and Ledda was scheduled for trial in early February 2015, but, in the weeks leading up to trial, the Bureau discovered that the bankruptcy petitions Morgan Drexen produced in the client files had been fabricated. The Bureau submitted evidence demonstrating that Morgan Drexen and Williamson & Howard had worked together to manufacture hundreds of these bankruptcy petitions in the two weeks prior to the production deadline.

62. After an evidentiary hearing, the U.S. District Court for the Central District of California found that the hundreds of bankruptcy petitions were indeed fakes, and that Morgan Drexen had attempted to use the petitions to create the false impression that bankruptcy work had been performed for consumers.

63. On April 21, 2015, as a result of Morgan Drexen's blatant misconduct in manufacturing and destroying evidence, the District Court issued terminating sanctions against Morgan Drexen. Shortly thereafter, Morgan Drexen filed for bankruptcy.

***Defendants Take Over Morgan Drexen's Role in the Debt Relief Scheme***

64. Even before the spoliation of evidence came to light, Defendants had begun to prepare for an adverse trial outcome by transferring the debt relief work that Morgan Drexen had been performing to Howard Law and Williamson & Howard.

65. In 2014, Defendants transferred the entire Morgan Drexen creditor relations department—approximately 20 employees who were responsible for negotiating with creditors—to Williamson & Howard.

66. In 2015, Defendants transferred at least 50-60 other Morgan Drexen employees to Howard Law, including staff from the intake services department, accounting department, and client services department. At Howard Law, these staff performed the same work for the same consumers as when they had been employed by Morgan Drexen.

67. Other top Morgan Drexen executives, directors, and managers also worked for the Defendants, including Morgan Drexen's Chief Legal Officer, Chief Financial Officer, Chief Technology Officer, and the Manager of the department that negotiated with creditors.

68. Defendants' transfer of Morgan Drexen employees was facilitated by the fact that Morgan Drexen, Howard Law, and Williamson & Howard all shared the same office space. Indeed, at a certain point, Morgan Drexen's former CEO could not even tell if people working in the office were Morgan Drexen employees or Williamson & Howard employees.

69. Walter Ledda, Morgan Drexen's former CEO, confirmed Vincent Howard's intent to continue the debt relief scheme after the District Court issued a default judgment against Morgan Drexen in April 2015:

> "My last conversation with Howard was in the parking lot when I was resigning, and he told me that, you know, that he was going to continue with his – with his program, without Morgan Drexen. And my understanding [was] that Williamson & Howard was going to do. So, where Morgan Drexen could no longer operate, the law firm will continue without Morgan Drexen . . . . The Williamson & Howard law

firm was my understanding of how . . . they were going to continue according to Mr. Howard."

70. Defendants were thus well situated to continue the unlawful debt relief operations when Morgan Drexen ceased operations on June 18, 2015. On that day, the District Court entered a permanent injunction ("Injunction") against the company that, among other things, permanently restrained and enjoined Morgan Drexen from collecting any further fees from consumers who had paid up-front fees to Morgan Drexen prior to Morgan Drexen renegotiating, settling, reducing, or otherwise altering the terms of at least one of such consumers' debts, or from consumers who had enrolled in the debt relief program in response to Morgan Drexen's deceptive advertisements.

71. After the Injunction was entered, the Bureau learned that the Defendants had taken over Morgan Drexen's business operations and were continuing to charge fees to the very consumers the Injunction was intended to protect.

72. From June 2015 to October 2015, the Defendants collected over $5.2 million from consumers who had signed up for the unlawful debt relief scheme through Morgan Drexen.

## THE TELEMARKETING SALES RULE

73. The TSR, as amended, was promulgated for the explicit purpose of preventing consumer harm from debt relief operations like Defendants'. 75 Fed. Reg. 48458 (Aug. 10, 2010).

74. The TSR as amended, 16 C.F.R. § 310.2(o), defines "debt relief service" as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payments or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector."

75. The TSR, 16 C.F.R. § 310.2(gg), defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call."

76. The TSR, 16 C.F.R. § 310.2(dd), defines "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."

77. The TSR, 16 C.F.R. § 310.2(ff), defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor."

78. Defendants are "sellers" or "telemarketers" of "debt relief services," who engage in "telemarketing," as defined in the TSR. 16 C.F.R. § 310.2.

79. The TSR does not provide an exemption for attorneys practicing law in connection with debt relief.

80. In promulgating the TSR, the FTC made clear that a provider cannot evade the rule by including a "'product,' such as educational material on how to manage debt, as part of the service it offers." Telemarketing Sales Rule, 75 Fed. Reg. at 48467.

81. The TSR, 16 C.F.R. §§ 310.4(a)(5)(i)(A) and (B), provides that a seller or a telemarketer may not request or receive payment of any fee or consideration for any debt relief service until and unless, among other things, "[t]he seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer" and "[t]he customer has made at least one payment" pursuant to such an agreement or plan.

82. The TSR, 16 C.F.R. § 310.4(a)(5)(i)(C), provides that a seller or a telemarketer may not request or receive payment of any fee or consideration for any debt relief service where debts are settled individually unless the fee or consideration either:

(1) "[b]ears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount"; or (2) "[i]s a percentage of the amount saved as a result of the negotiation, settlement, reduction, or alteration."

83. The TSR, 16 C.F.R. § 310.3(a)(2)(ii), prohibits a seller or telemarketer from misrepresenting, directly or by implication, in the sale of goods or services, any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of a sales offer.

84. The TSR, 16 C.F.R. § 310.3(a)(2)(x), prohibits a seller or telemarketer from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of any debt relief service.

85. The TSR, 16 C.F.R. § 310.3(b), prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates, among other provisions, 16 C.F.R. §§ 310.3(a) or 310.4.

86. Violations of the TSR are also treated as violations of a rule under section 1031 of the CFPA regarding unfair, deceptive, or abusive acts or practices, 12 U.S.C. § 5531, 15 U.S.C. § 6102(c)(2).

## VIOLATIONS OF THE TSR
## COUNT I

87. Plaintiff re-alleges Paragraphs 1 – 86 and incorporates them herein by reference.

88. In the course of telemarketing debt relief services from October 27, 2010 to the present, Defendants requested or received payment of fees or consideration from consumers for debt relief services: (1) before they had renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the consumer,

and the consumer had made at least one payment pursuant to that agreement; and (2) that did not bear the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount and that were not a percentage of the amount saved as a result of the negotiation, settlement, reduction, or alteration.

89. Therefore, Defendants' acts or practices violate the TSR, 16 C.F.R. § 310.4(a)(5)(i), and are abusive acts or practices in telemarketing.

## COUNT II

90. Plaintiff re-alleges Paragraphs 1 – 86 and incorporates them herein by reference.

91. In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, or sale of debt relief services, Defendants have represented, directly or by implication, that consumers are not charged an advance fee for Defendants' debt relief services.

92. In fact, consumers are charged advance fees for Defendants' debt relief services.

93. Therefore, Defendants' representations as described herein violate the TSR, 16 C.F.R. § 310.3(a)(2)(ii) and (x), and are deceptive acts or practices in telemarketing.

## COUNT III

94. Plaintiff re-alleges Paragraphs 1 – 86 and incorporates them herein by reference.

95. In numerous instances, Defendants have provided substantial assistance and support to Morgan Drexen and Walter Ledda, including by developing intake procedures, contracts, and document templates and other components of the debt relief program that were integrated into Morgan Drexen's computer platform; serving as the signatories on contracts with consumers enrolled in the debt relief scheme; developing a network of associate attorneys; overseeing television advertisements for the debt relief scheme;

creating the two-contract debt relief model as a way to attempt to evade the requirements of the TSR; training and supervising Intake Specialists; making automatic withdrawals from consumer bank accounts; and manufacturing evidence in the Plaintiff's lawsuit against Morgan Drexen.

96. Defendants provided such substantial assistance or support to Morgan Drexen and Walter Ledda while knowing or consciously avoiding knowing that Morgan Drexen and Ledda were engaged in acts or practices that violated §§ 310.3(a) and 310.4 of the TSR.

97. Therefore, Defendants' substantial assistance as described herein violates the TSR, 16 C.F.R. § 310.3(b), and is a deceptive act or practice in telemarketing.

## CONSUMER INJURY

98. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public.

## THIS COURT'S POWER TO GRANT RELIEF

99. The CFPA empowers this Court to grant any appropriate legal or equitable relief with respect to violations of Federal consumer financial law, including, without limitation, permanent or temporary injunction, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and civil money penalties. 12 U.S.C. § 5565(a).

## PRAYER FOR RELIEF

100. Wherefore, the Bureau requests that the Court:
    a. Award Plaintiff such injunctive and ancillary relief as may be necessary to enjoin Defendants from harming consumers including but not limited to limits on activities or functions of Defendants;

     b. Permanently enjoin Defendants from harming consumers through the advertisement, marketing, promotion, offering for sale, or selling of any consumer financial product or service, including but not limited to any debt relief product or service;

     c. Permanently enjoin Defendants from committing future violations of the TSR and CFPA;

     d. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR and CFPA, including, but not limited to, rescission or reformation of contracts, the refund of moneys paid, restitution, and disgorgement or compensation for unjust enrichment;

     e. Award Plaintiff civil money penalties; and

     f. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: January 30, 2017

Respectfully submitted,

ANTHONY ALEXIS  
Enforcement Director

CARA PETERSEN  
Deputy Enforcement Director For Litigation

R. GABRIEL D. O'MALLEY  
Assistant Litigation Deputy

/s Jan Singelmann  
Jan Singelmann  
(E-mail: jan.singelmann@cfpb.gov)  
(Phone: 202-435-9670)  
Amy Radon  
(E-mail: amy.radon@cfpb.gov)

(Phone: 202-435-9142)  
*Enforcement Attorneys*  
Consumer Financial Protection Bureau  
1700 G Street NW  
Washington, DC 20552  
Fax: (202) 435-7722