1  | Sean A. O'Keefe, Esq. (SBN 122417)
2  | OKEEFE & ASSOCIATES
   | LAW CORPORATION, P.C.
3  | 575 Anton Blvd., Suite 1050
   | Costa Mesa, CA 92626
4  | Tel.: 949.334.4135
   | Email: sokeefe@okeefelc.com
5  |
6  | Douglas B. Vanderpool, Esq.  (SBN 162857)
   | Heather A. Tovar, Esq.  (SBN 237004)
7  | THE VANDERPOOL LAW FIRM
   | 330 Main Street, Suite 203B
8  | Seal Beach, CA 90740
   | Tel:  562.431.6900; Fax: 714.276.0558
9  | Email: doug@vanderpool-law.com;
   | heather@vanderpool-law.com
10 |
11 | Attorneys for Howard Law, P.C.,
   | The Williamson Law Firm, LLC, Williamson &
12 | Howard, LLP, Vincent D. Howard,
   | and Lawrence Williamson
13 |

14 | **UNITED STATES DISTRICT COURT**

15 | **CENTRAL DISTRICT OF CALIFORNIA**

16 |

| CONSUMER FINANCIAL PROTECTION BUREAU, | Case No. 8:17-CV 00161 |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT OR IN THE ALTERNATIVE FOR MORE DEFINITE STATEMENT** |
| VINCENT HOWARD, LAWRENCE W. WILLIAMSON, HOWARD LAW, P.C., THE WILLIAMSON LAW FIRM, LLC, AND WILLIAMSON & HOWARD, LLP, | **HON. JOSEPHINE L. STATON** |
| Defendants. | **DATE: May 19, 2017** **TIME: 2:30 P.M.** **PLACE: Ctrm. 10A** |

1     **PLEASE TAKE NOTICE** that on May 19, 2017 at 2:30 p.m. in Department

2 10A of the above-entitled Court, located at 411 West 4th Street, Santa Ana, Howard

3

4 Law, P.C., Williamson & Howard, LLP, The Williamson Firm, LLC, Vincent Howard

5 and Lawrence Williamson (collectively the "Defendants") will move this Court for an

6 order granting the following relief: A) Dismissing all claims alleged in that certain

7

8 *Complaint for Permanent Injunction and Other Relief* (the "Attorney Complaint") filed

9 by the Consumer Financial Protection Bureau (the "CFPB" or the "Plaintiff") attached

10
11 to the accompanying Declaration of Sean A. O'Keefe as Exhibit "A"; B) if the

12 foregoing prayer for dismissal is not granted, compelling the Plaintiff to provide a more

13 definite statement with respect to each claim alleged; and C) granting such further relief

14
15 as the Court deems just and proper. This motion is based upon the attached declaration

16 of Sean A. O'Keefe and the within cited authorities.[1]

17 DATED: March 30, 2017        OKEEFE & ASSOCIATES

18                             LAW CORPORATION, P.C.

19                               /s/ Sean A. O'Keefe

20                    By: _____

21                           Sean A. O'Keefe, attorneys for
                          the Defendants

22 DATED: March 30, 2017        THE VANDERPOOL LAW FIRM

23

24                               /s/ Douglas B. Vanderpool
                   By: _____

25                           Douglas B. Vanderpool, attorneys

26                           for the defendants

27
28 [1] The Defendants have contacted the Plaintiff, in accordance with the Local Rules, and the Plaintiff has confirmed it opposes this motion.

i

1

# **TABLE OF CONTENTS**

2

Section I: Summary Of Material Facts...................................................................1

3

4

     A.     The Defendants................................................................1

5

     B.     The MD Case..................................................................2

6

     C.     The Injunction Against Morgan Drexen and Ledda..................3

7

8

     D.     The Clarification Order and Contempt Order and The Appeal.......4

9

     E.     The CFPB's Latest Action Against The Appellants..................4

10

Section II:  Legal Authorities.............................................................5

11

12

     A.     The Legal Burden.............................................................5

13

     B.     Issue # 1: Constitutionality of CFPB.....................................6

14

     C.     Issue # 2:  Lack of Standing................................................6

15

16

     D.     Issue # 3:  Lack of Case Controversy As To Injunction Claim......15

17

     E.     Issue # 4:  Failure To State A Claim....................................15

18

19

     F.     Issue # 5:  Judicial Estoppel..............................................20

20

     G.     Issue # 6:  Issue Preclusion...............................................22

21

     H.     Issue # 7: Statute of Limitations.........................................24

22

23

Section III:  Conclusion...................................................................25

24

Exhibit A: ..................................................................................26

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2

### **CASES**

3

4

ABA v. FTC, 430 F.3d 457, 471 (D.C.Cir.2005)...................................12, 13

5

Anaya v. Barrios, 2017 WL 345206, at 2 (E.D.CA 2017)...............................24

6

7

Anderson v. Clow (In re Stac Elecs. Sec. Litig.), 89 F.3d 1399, 1404–05 (9th Cir.1996)................................................................................6, 19

8

9

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1968-69 (2007)........5

10

Cantor v. Detroit Edison Co., 428 U.S. 579, 592, 96 S. Ct. 3110, 3118 (1976)..........12

11

City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)...................................15

12

13

D'Ambrosio v. Spalding, 2013 WL 6147245, at 1–2 (D. Ariz. 2013).....................1

14

Denny v. Barber, 576 F.2d 465, 469 (2d Cir.1978)........................................17

15

16

DiVittorio v. Equidyne Extractive Industries, Inc., 822 F.2d 1242, 1247 (2d Cir.1987)..............................................................................17

17

Dombrowski v. Pfister, 380 U.S. 479, 485 (1965).........................................15

18

19

Eagle Foundation, Inc. v. Dole, 813 F.2d 798, 810 (7th Cir.1987) ......................24

20

FDA v. Brown Williamson Tobacco Corp., 529 U.S. 120, 160-61, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).................................................................12

21

22

Fed. Trade Comm'n v. Ivy Capital, Inc., 2011 WL 2118626, at 3 (D. Nev. 2011).......16

23

Fed. Trade Comm'n v. Lake, 181 F. Supp. 3d 692, 700–01 (C.D. Cal. 2016)......17, 18

24

25

Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S. Ct. 1291, 1301 (2000).........................................................11

26

27

F.T.C. v. ELH Consulting, LLC, 2013 WL 4759267, at 1 (D. Ariz. 2013).............15

28

F.T.C. v. Lights of Am., Inc., 760 F. Supp. 2d 848, 853 (C.D. Cal. 2010).............16

1

2
Hale v. U.S. Trustee, 509 F.3d 1139 (9th Cir. 2007)......................................13

3
Hamilton v. State Farm Fire & Cas., 270 F.3d 778, 782 (9th Cir.2001)……....….....22

4
In re Larrieu, 2000 WL 743705, at 2 (Bankr. E.D. Pa. 2000)..........................13

5
In re Stratton, 299 B.R. 616, 623 (Bankr. D. Or. 2003)....................................14

6
Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1050 (9th Cir.2008).......................22

7

8
Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir.1986)..............................................17

9
MacElvain v. United States, 2002 WL 31083659, at 3 (M.D. Ala. 2002)................15

10
Matter of Leitner, 221 B.R. 502, 503 (Bankr. D. Neb. 1998)….............................18

11

12
Parklane Hosiery Co. v. Shore, 439 U.S. 322, 330, 99 S. Ct. 645, 651 (1979...........22

13
Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549-50 (8th Cir.1997)....................17

14

15
Pierce v. Cantil-Sakauye, 2013 WL 4382735, at 3 (N.D. Cal. Aug. 13, 2013….........1

16
PHH Corp. v. Consumer Fin. Prot. Bureau, 839 F.3d 1, 12 (D.C. Cir. 2016).............6

17
Rissetto v. Plumbers & Steamfitters Local, 94 F.3d 597, 600–601 (9th Cir.1996)…...20

18

19
Robi v. Five Platters, Inc., 838 F.2d 318, 322 (9th Cir. 1988)............................24

20
Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir.1990)................................20, 21

21
Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103–04 (9th Cir. 2003).......6, 18, 19

22

23
White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000)..........................................1

24
**STATUTES**

25
Fed. R. Bankr. P. 2016.................................................................14, 18

26
Fed. R. Bankr. P. 2017.................................................................14, 18

27

28

Fed. R. Civ. Proc 9(b)..................................................................6, 15, 16, 17, 18, 20

Fed. R. Civ. Proc. 12(b)(1)............................................................................1

Fed. R. Civ. Proc 12(b)(6)............................................................................1

11 U.S.C. § 327..........................................................................................14

11 U.S.C. § 329..............................................................................13, 14, 18

11 U.S.C. § 330..........................................................................................13

12 U.S.C. § 5481(5)......................................................................................7

12 U.S.C. § 5511......................................................................................6, 10

12 U.S.C. §5517............................................................................................7

12 U.S.C. § 5517(e).....................................................................................11

12 U.S.C. § 5517(e)(1)...................................................................................6

12 U.S.C. § 5561.........................................................................................10

12 U.S.C. §5581(b)(5)(b)..............................................................................10

15 U.S.C. 41..........................................................................................10, 11

15 U.S.C. § 57(b)........................................................................................25

15 U.S.C. Chap. 87........................................................................................3

15 U.S.C. § 6102..............................................................................11, 13, 25

15 U.S.C. § 6102(d).....................................................................................10

15 U.S.C. § 6102(e).....................................................................................10

15 U.S.C. § 6103.........................................................................................10

15 U.S.C. §6104..........................................................................................10

15 U.S.C. §6105(d)……………………………………..………………10. 13

16 CFR Part 310………………………………………….…………………3

Section 11 1933 Securities Act……………………………….……………….6

## SECONDARY SOURCES

5 C. Wright & A. Miller, <u>Federal Practice and Procedure</u> § 1216, pp. 235-236 (3d ed. 2004)………………………………………………………..……………..5

Cong. Rec. 2010-07-15-pt1-Pg. E1347………………………………….…...9

<u>The Consumer Bankruptcy Fee Study Final Report</u> (2011), Lois R. Lupica Maine Law Foundation Professor of Law University of Maine School of Law……………..………13

www.congress.gov/crec/2010/07/15/modified/CREC-2010-07-15-pt1-PgE1347.htm…8

## MEMORANDUM OF POINTS AND AUTHORITIES

### Section I: Summary Of Material Facts

The facts stated herein are based upon the allegations in the Complaint, certain findings made by this Court in the case of <u>Consumer Financial Protection Bureau v. Morgan Drexen, Inc., and Walter Ledda</u>, Case No. SACVIJ-01267 JST (JEMx) (the "MD Case"), and statements made in prior filings in the MD Case.[1]

**A.   The Defendants.** Vincent Howard and Lawrence Williamson[2] are licensed to practice law in California and Kansas, respectively. The other Defendants are law firms through which they provide legal services. (Ex. B, O'Keefe Dec., P. 24-25 ¶¶ 4, 7; Ex. C, P. 49, ¶ 4). During the time frame referenced in the Attorney Complaint, the Defendants were in the business of practicing law, (Ex. B, O'Keefe Dec., P. 24; Ex. C, P. 49, ¶ 4), and all services offered by the Defendants during this

---

[1] The Court can consider the court records in this case and in the MD Case within the context of a motion under Federal Rule of Civil Procedure 12(b)(6). <u>See</u> <u>D'Ambrosio v. Spalding</u>, 2013 WL 6147245, at 1–2 (D. Ariz. 2013) ("For purposes of this action, the Court takes judicial notice of the December 27, 2012 Order filed in an earlier related case."); <u>Pierce v. Cantil-Sakauye</u>, No. C 13-01295 JSW, 2013 WL 4382735, at 3 (N.D. Cal. Aug. 13, 2013), <u>aff'd</u>, 628 F. App'x 548 (9th Cir. 2016) ("On a motion to dismiss pursuant to either Rule 12(b)(1) or Rule 12(b)(6), the Court may take judicial notice of court records in other cases."); <u>see also</u> <u>White v. Lee</u>, 227 F.3d 1214, 1242 (9th Cir. 2000) ("With a factual Rule 12(b)(1) attack, however, a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment.").

[2] Williamson & Howard, LLP and The Williamson Firm, LLC closed their practices after the entry of the Contempt Order and Howard Law closed its bankruptcy/ debt-settlement practice. Defendant Lawrence Williamson does not currently practice law.

time frame were integral "part" of their ongoing "practice of law." (Ex. B, O'Keefe Dec., P. 24; Ex. C, P. 49, ¶ 4) .

Every individual who engaged the Defendants' services during the period alleged in the Attorney Complaint was a "client", every relationship formed during this time was an "attorney-client relationship", and every client retained signed an attorney-client retainer agreement detailing the legal services being provided by the Defendants within the context of this legal relationship. (Ex. B, O'Keefe Dec., P. 24, ¶ 16).

Like many other law firms nationwide, the Defendants outsourced certain support services to reduce costs, and to the greatest extent possible, focus on legal matters. In furtherance of this goal, the Defendants employed the services of Morgan Drexen, Inc., on a fee-for-service basis in 2011. (Ex. B, O'Keefe Dec., P. 24, ¶ 16). At no time did Morgan Drexen have a direct contractual relationship with any of the individuals whose legal needs were serviced by the Defendants, and at no time did any of the Defendants "share" fees that were paid to them by their clients with Morgan Drexen. Id.

**B.    The MD Case**. The investigation that led to the filing of the complaint in the MD Case (the "MD Complaint") against Morgan Drexen was initiated by the CFPB in February 2012. When the Defendants became aware of the CFPB's investigation, Defendant Williamson flew to the CFPB's Washington, D.C. office and met with the CFPB's attorneys for two hours. During this meeting, Mr. Williamson fully disclosed every material aspect of the Defendants' contractual relationship with

their clients, the Defendants' separate contractual relationship with Morgan Drexen, and confirmed that they and their law firms were in the business of practicing law, no more.

On August 20, 2013, the CFPB filed the MD Complaint against Morgan Drexen and Ledda, alleging that these parties had violated certain provisions of the CFPA, the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. Chap. 87, and the Telemarketing Sales Rule ("TSR"), 16 CFR Part 310, relating to offering "debt relief" services. (O'Keefe Dec., Ex. D). The CFPB intentionally excluded the Defendants from the MD Case, as parties.

**C.      The Injunction Against Morgan Drexen and Ledda**. On April 21, 2015, this Court issued terminating sanctions against Morgan Drexen in the MD Case based upon, <u>inter alia</u>, the CFPB's contention that Morgan Drexen had fabricated evidence in response to the CFPB's discovery requests. (Ex. H, O'Keefe Dec.). According to this ruling, the evidence showed that Morgan Drexen had failed to complete a number of bankruptcy petitions for the so-called "Affected Consumers," and had attempted to cover up this failure during the case. <u>Id.</u>

On April 30, 2015, a month and a half before the Injunction was entered, Morgan Drexen filed a petition under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Central District of California initiating <u>In re Morgan Drexen, Inc.,</u> Case No. 8:15-bk-12278-CB (the "Bankruptcy Case"). Jeffrey I. Golden served as Morgan Drexen's Chapter 7 trustee (the "Trustee").

3

On June 18, 2015, this Court entered the Injunction—a final judgment. (O'Keefe Dec., Ex. F). This ruling effectively barred Morgan Drexen from providing any further services. On the day the Injunction was entered, the Trustee advised this Court that he had closed Morgan Drexen's operations. (MD Case Dist. Ct. Dkt No. 307).

**D.      The Clarification Order and Contempt Order and The Appeal.**

On July 6, 2015, the Court entered an order (the "Clarification Order") wherein the Court stated that certain unspecified provisions in the Injunction could apply to Defendants based on their pre-Injunction business relationship with Morgan Drexen. After the Clarification Order was entered, the CFPB filed a motion (the "Contempt Motion") (MD Case Dkt. 348) seeking to an order holding the Defendants in contempt of the Injunction. A hearing was held on the Contempt Motion on September 9, 2015, and on October 9, 2015, the Court entered an order holding the Defendants in contempt of the Injunction (the "Contempt Order").

On October 26, 2016, the Ninth Circuit issued a ruling reversing both the Clarification Order and the Contempt Order.

**E.      The CFPB's Latest Action Against The Appellants.**

On January 30, 2017, four years after the filing of the MD Complaint, and more than two years after obtaining a final judgment thereon, the CFPB filed the complaint initiating the instant case against the Defendants (the "Attorney Complaint"). (O'Keefe Dec., Ex. A). In the Attorney Complaint, the CFPB is attempting to execute a 180 degree turn in reference to the positions the CFPB had taken in the MD Case. Where

the CFPB previously alleged that Morgan Drexen alone engaged in a series of actions that violated the CFPA and the TSR, the CFPB now contends that these same actions were in fact taken by the Defendants. Where the CFPB previously alleged in the MD Complaint that Morgan Drexen's actions caused $110 million in damages to the "Affected Consumers", the CFPB now contends that the Defendants' actions somehow caused these exact same damages to this exact same constituency.

As the within authorities establish, the CFPB lacks standing to pursue the claims alleged in the Attorney Complaint, the claims are barred by the statute of limitations, judicial estoppel and issue preclusion, and the injunction claims fails to present a "case or controversy".

## Section II: Legal Authorities

**A.**     **The Legal Burden**. To state a viable claim for relief, a plaintiff must plead factual allegations with sufficient clarity and specificity to state a right to relief "above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1968-69 (2007); see also 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). A complaint based upon a "formulaic recitation of the elements of a cause of action" will not survive a motion to dismiss. Id. Moreover, to the extent a claim "sounds in fraud", such as the claims alleged in this case, the allegations therein must satisfy the higher pleading standard set

forth in Federal Rule of Civil Procedure 9(b). <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1103–04 (9th Cir. 2003); <u>see also</u> <u>Anderson v. Clow (In re Stac Elecs. Sec. Litig.)</u>, 89 F.3d 1399, 1404–05 (9th Cir.1996) ("We now clarify that the particularity requirements of Rule 9(b) apply to claims brought under Section 11 [of the 1933 Securities Act] when, as here, they are *grounded in fraud*.").

**B.   Issue # 1: Constitutionality of CFPB**. The United States Court of Appeals for the District of Columbia is presiding over a case wherein the constitutionality of the CFPB has been challenged. (Case No. 15-1177). The first appellate panel ruled that the CFPB was indeed unconstitutional, however, this matter is now being considered by that circuit <u>en banc</u>. <u>PHH Corp. v. Consumer Fin. Prot. Bureau</u>, 839 F.3d 1, 12 (D.C. Cir. 2016), <u>reh'g en banc granted, order vacated</u> (Feb. 16, 2017). A true and correct copy of brief filed by the petitioner in that case, PPH Corp. is attached to the O'Keefe Declaration as Exhibit "G". Due to the page limitation imposed by the Local Rules, the Defendants hereby incorporate the arguments made in the PHH brief in their entirety and respectfully pray that the Court consider those arguments as if fully set forth herein.  <u>Id.</u>

**C.   Issue # 2: Lack of Standing.** The Consumer Financial Protection Act, 12 U.S.C. § 5511 (the "CFPA"), is the CFPB's founding statute. It establishes and restricts the powers vested in this agency. The restrictive section in the CFPA implicated by the allegation in the Complaint is section 5517(e)(1):

**(e) Exclusion for practice of law**
**(1) In general**
     Except as provided under paragraph (2), the Bureau may not exercise ***any supervisory or enforcement authority*** with respect to an activity engaged in by an attorney ***as part of*** *the practice of law* under the laws of a State in which the attorney is licensed to practice law.
**(2) Rule of construction**
     Paragraph (1) shall not be construed so as to limit the exercise by the Bureau of any supervisory, enforcement, or other authority regarding the offering or provision of a consumer financial product or service described in any subparagraph of section 5481(5) of this title--
     **(A)** that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or
     **(B)** that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service.

12 U.S.C. § 5517 (emphasis added). The exclusion in paragraph (1) of this section is

*agency specific*, not statute specific. It places an entire category of activity outside the

CFPB's regulatory power.

     This is clear from the statutory language. The words "any authority" are not

limited by the words "under the CFPA". The language in this section is also very

broad. The categorical exclusion encompasses "an activity", as in *any activity* that is

engaged in by an attorney "as part" of the "practice of law". The words "as part" would

naturally include any activity that is deemed a part of a law practice.

     Although less than a model of clarity, the interpretative limitation in section (2)

of Section 5517 states, in essence, that the practice of law exclusion in paragraph (1)

precludes any regulation of an activity, even where a "financial product or service" is

offered, if said product or service is "offered or provided as part of, or incidental to,

the practice of law." Stated in the obverse, regulation is only authorized where such product or service is not offered as "part" of the "practice of law". The intent of this provision was to make sure that attorneys who offer "financial products or services" as "part" of "an activity" that was not part of the "practice of law", are not immunized from regulatory action. For example, if an attorney sold tax shelters through a brokerage firm that he or she owned and operated, this activity, falling outside the practice of law, would be subject to regulation.

In this case, the CFPB asserts that the Defendants fall outside the broad exclusion in Section 5517, because they were providing "debt settlement" services to their clients. This position is untenable. Every bankruptcy attorney practicing law in this country engages in preliminary "workout" or "debt settlement" negotiations before pulling the trigger on a bankruptcy case. To do otherwise would not only be improvident, but arguably malpractice. Bankruptcy filings are cumbersome and often expensive. If creditor claims can be resolved outside this process through negotiations, it is always the preferred avenue.

Reading the limitation in the above section as an agency power limitation is also accord with the comments that appear in the Congressional Record.[3] The following excerpt from this record makes that crystal clear:

---

[3] www.congress.gov/crec/2010/07/15/modified/CREC-2010-07-15-pt1-PgE1347.htm

8

Conceptually, the activities Congress intends to give the Bureau authority to regulate ``the offering or provision of a financial product or service''--are distinguishable from the practice of law. But because of the breadth of the authority being given the Bureau, including the definitions of ``covered person'' and ``financial product or service,'' and the complexities of the practice of law, there was concern about potential overlap. **And giving the new Bureau authority to regulate the practice of law could materially interfere with and jeopardize sensitive aspects of the attorney-client relationship, including the attorney-client privilege and work product protection that enable clients to obtain sound legal advice from their attorneys on a protected confidential basis**. ... And because one of the foremost, and at times most complex, ethical obligations is for an attorney to represent the client zealously within the bounds of the law, there would be a significant likelihood of attorneys being impeded in meeting their obligations to their clients and to the legal system they are sworn to protect.

**Even if the Bureau's authority could be reliably confined to legal representation in financial matters, the result would be material harm to consumer clients of bankruptcy lawyers, consumer lawyers, and real estate lawyers--the very consumers the Bureau is being created to protect. But the harm would inevitably be far broader, extending into unrelated aspects of legal practice.**

**For those reasons, our Committee was determined to avoid <u>any possible overlap</u> between the Bureau's authority and the practice of law.**

Cong. Rec. 2010-07-15-pt1-Pg. E1347, bold added.

In response to the foregoing statutory preclusion, the CFPB will contend that it is empowered to enforce the TSR since this rule does "not provide an exemption for attorneys practicing law in connection with debt relief." This argument fails for the following reasons. First, as set forth below, the CFPA statute authorizing the CFPB to exercise authority over consumer regulatory statutes and rules transferred to the CFPB specifically states that the CFPB's authority is subject to the limitations in subtitle B of the CFPA—the subtitle that includes the attorney exemption.

9

**(5)FEDERAL TRADE COMMISSION**
**(A)Transfer of functions**
The authority of the Federal Trade Commission under an enumerated consumer law to prescribe rules, issue guidelines, or conduct a study or issue a report mandated under such law shall be transferred to the Bureau on the designated transfer date. Nothing in this title shall be construed to require a mandatory transfer of any employee of the Federal Trade Commission.
**(B)Bureau authority**
**(i)In general**
The Bureau shall have all powers and duties under the enumerated consumer laws to prescribe rules, issue guidelines, or to conduct studies or issue reports mandated by such laws, that were vested in the Federal Trade Commission on the day before the designated transfer date.
**(ii)Federal Trade Commission Act**
***Subject to part B***, the Bureau may enforce a rule prescribed under the Federal Trade Commission Act [15 U.S.C. 41 et seq.] by the Federal Trade Commission with respect to an unfair or deceptive act or practice to the extent that such rule applies to a covered person or service provider with respect to the offering or provision of a consumer financial product or service as if it were a rule prescribed under section 5531 of this title.

12 U.S.C. § 5581(b)(5)(b).

Second, this same restrictive language appears in the sections of the Federal Trade Commission Act ("FTCA") that transfer authority to the CFPB—the very section cited by the CFPB in the Attorney Complaint as vesting the bureau with the power to assert claims under the TSR. 15 U.S.C. § 6105(d) states:

**(d) ENFORCEMENT BY BUREAU OF CONSUMER FINANCIAL PROTECTION**
Except as otherwise provided in sections 6102(d), 6102(e), 6103, and 6104 of this title, ***and subject to subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.]***, this chapter shall be enforced by the Bureau of Consumer Financial Protection under subtitle E of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5561 et seq.], with respect to the offering or provision of a consumer financial product or service subject to that Act.

15 U.S.C. § 6102 states:

> **(B) Bureau authority**
> **(i)In general**
> The Bureau shall have all powers and duties under the enumerated consumer laws to prescribe rules, issue guidelines, or to conduct studies or issue reports mandated by such laws, that were vested in the Federal Trade Commission on the day before the designated transfer date.
> **(ii) Federal Trade Commission Act**
> ***Subject to part B***, the Bureau may enforce a rule prescribed under the Federal Trade Commission Act [15 U.S.C. 41 et seq.] by the Federal Trade Commission with respect to an unfair or deceptive act or practice to the extent that such rule applies to a covered person or service provider with respect to the offering or provision of a consumer financial product or service as if it were a rule prescribed under section 5531 of this title.

The inclusion of the words "subject to part B" of the CFPA in the above statutes conveys a clear legislative message: The CFPB can only exercise regulatory authority under these transferred statutes and rules "subject to" the exemptions and restrictions in subtitle B of the CFPA. See Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S. Ct. 1291, 1301 (2000) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'"). One of the restrictions in this subtitle bars the exercise of authority over any actions that a lawyer engages in as "part" of the "practice of law." 12 U.S.C. § 5517(e). Accordingly, the CFPB's anticipated attempt to achieve an end-run around this restriction should be rejected as contrary to the plain language in the applicable statutes.

1    The court should also reject the CFPB's overreach based upon what is *not* in

2  CFPA and in the FTCA (the TSR was enacted pursuant to the FTCA). The regulation

3
4  of the practice of law is "traditionally the province of the [S]tates" unless Congress

5  grants the agency regulatory authority through clear and unambiguous statutory

6  language. See ABA v. FTC, 430 F.3d 457, 471 (D.C.Cir.2005). As the court explained

7
8  in the ABA[4] case:

9         When we examine a scheme of the length, detail, and intricacy of the one
          before us, we find it difficult to believe that Congress, by any remaining
10         ambiguity, intended to undertake the regulation of the profession of law-a
          profession never before regulated by "federal functional regulators"-and
11         never mentioned in the statute. To find this interpretation deference-worthy,
          we would have to conclude that Congress not only had hidden a rather large
12         elephant in a rather obscure mouse hole, but had buried the ambiguity in
          which the pachyderm lurks beneath an incredibly deep mound of specificity,
13         none of which bears the footprints of the beast or any indication that
          Congress even suspected its presence. We therefore seriously doubt that
14         Congress intended to empower the Commission to undertake that regulation,
          and we are reluctant to even afford the regulation the deference due agency
15         action that survives the analysis at the first step of Chevron. See FDA v.
16         Brown Williamson Tobacco Corp., 529 U.S. 120, 160-61, 120 S.Ct. 1291,
          146 L.Ed.2d 121 (2000)."
17
18
19  ABA v. FTC, 430 F.3d 457, 469 (D.C. Cir. 2005); see also Cantor v. Detroit Edison

20  Co., 428 U.S. 579, 592, 96 S. Ct. 3110, 3118 (1976) ("Second, if the State is already

21
22  regulating an area of the economy, it is arguable that Congress did not intend to

23  superimpose the antitrust laws as an additional, and perhaps conflicting, regulatory

24
25
26
27  [4] In the ABA case, the FTC attempted the same overreach that is in play in this case,
28  albeit in reliance upon certain privacy provisions in the Gramm-Leach-Bliley. The
     circuit court for the District of Columbia rejected this effort.

mechanism."). In this case, both of the statutes relied upon by CFPB, 15 U.S.C. §§ 6102, 6105(d), unlike the statute in contest in the ABA case, include specific exemptions for any action taken as "part" of the practice of law. Accordingly, a far stronger case exists here than in the ABA case for denying the CFPB's overreach.

Finally, the "up front" retainers paid in this case were paid for bankruptcy services. Congress has already spoken on this topic in the bankruptcy code and in the bankruptcy rules. As one study correctly noted, "Attorney fees in consumer bankruptcy cases are subject to a relatively high level of statutory, administrative, and judicial scrutiny." The Consumer Bankruptcy Fee Study Final Report (2011), Lois R. Lupica Maine Law Foundation Professor of Law University of Maine School of Law. By way of example, section 329 of the Bankruptcy Code requires counsel to disclose all compensation received in a case *within the year preceding the petition,* see In re Larrieu, 2000 WL 743705, at 2 (Bankr. E.D. Pa. 2000)I ("***Thus, § 329 applies to attorneys representing debtors in the bankruptcy case as well as attorneys who provide legal advices to debtors in connection with the case or in contemplation of the case.***"), and this statute authorizes the bankruptcy court to review the reasonableness of such compensation. See e.g. Hale v. U.S. Trustee, 509 F.3d 1139 (9th Cir. 2007) (errors in attorney work product justified scrutiny and disgorgement of attorney fee).

Section 330 of the Bankruptcy Code, which sets forth a "reasonable compensation" standard, applies when determining the reasonableness of services

rendered *prepetition* and post-petition. In Chapter 7 cases, § 327 of the Bankruptcy Code states that a debtor's attorney must be appointed by the trustee and approved by the court to receive fees post-petition or post-conversion. Bankruptcy Rules 2016 and 2017 implement § 329 and govern the disclosure of fee arrangements by the debtor's attorney and the court's scrutiny of such arrangements.

When congress enacted this web of statutes, regulations and rules it was undoubtedly aware of the fact that attorneys who represent consumer debtors obtain their fees upfront as a matter of practice and necessity. See In re Stratton, 299 B.R. 616, 623 (Bankr. D. Or. 2003) ("Prudent counsel will not agree to pay the bankruptcy filing fees and to file the bankruptcy case without a retainer because the debtor's obligations to pay for pre-bankruptcy legal services will be discharged in the bankruptcy case."). To the extent congress had intended to impose a bar against the payment of upfront fees, thereby putting every Chapter 7 attorney in the country out of business, it would have implemented this drastic actions through the bankruptcy code, not in the CFPA.

In sum, any and all debt settlement efforts undertaken by bankruptcy attorneys like the Defendants, fall clearly within the practice of law exclusion cited above. Accordingly, any contention by the CFPB that no such exclusion appears in the TSR, and hence it is inapplicable, is unavailing. *The CFPB has no power to regulate the practice of law under any federal regulation.*

**D.** **Issue # 3: Lack of Case Controversy As To Injunction Claim**. The CFPB has admitted it has no evidence that the Defendants are continuing to offer either bankruptcy or debt settlement services (See, O'Keefe Dec., Ex. I, P. 000245). This is not surprising. The Defendants closed their bankruptcy and "debt settlement" practices *over a year ago*.[5] Accordingly, no case or controversy exists justifying the assertion of a claim for injunctive relief shutting down practices that no longer exist. See City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983); Dombrowski v. Pfister, 380 U.S. 479, 485 (1965)(noting "injunctive relief looks to the future"); MacElvain v. United States, 2002 WL 31083659, at 3 (M.D. Ala. 2002)("To allege a case or controversy for purposes of Article III standing, a plaintiff who seeks injunctive relief cannot rely only on past exposure to illegal conduct to establish a present controversy regarding injunctive relief. Instead, a plaintiff must allege that he faces a "real and immediate threat" that he "will again be wronged in a similar way.").

**E.** **Issue # 4: Failure To State A Claim.** The allegations in the Attorney Complaint fail to state a claim under the more stringent pleading standard in Rule 9(b), which are applicable. The case of F.T.C. v. ELH Consulting, LLC, 2013 WL 4759267, at 1 (D. Ariz. 2013) is all but directly on point on the issue of the application of Rule 9(b):

> Here, the FTC's complaint sounds in fraud in that it alleges that defendants engaged in deceptive acts and practices and "operate a tangled network of telemarketing companies and telemarketing service providers" who make

---

[5] The CFPB admitted this fact at the hearing held on February 9, 2017.

15

"representations" that are "false." Complaint, ¶¶ 18, 39, 40, and 41. Because the FTC's allegations sound in fraud, the court applies the heightened pleading standard of Rule 9(b) in evaluating the motion for judgment on the pleadings. Id.; see also F.T.C. v. Lights of Am., Inc., 760 F. Supp. 2d 848, 853 (C.D. Cal. 2010) Fed. Trade Comm'n v. Ivy Capital, Inc., 2011 WL 2118626, at 3 (D. Nev. 2011) ("The instant action "sounds in fraud," in that the FTC has alleged that the defendants collectively engaged in a unified course of fraudulent conduct, which forms the entire basis of the claims alleged.")

In the Attorney Complaint, the CFPB alleges that Morgan Drexen operated an elaborate deception scheme in violation of the TSR, and the Defendants rendered "substantial assistance" in furtherance of this scheme. The following exemplary allegations establish that these claims clearly "sound in fraud":

41. In short, this two-contract debt relief model was designed by Howard, Williamson, Howard Law, and The Williamson Law Firm to *disguise consumers' payments* of unlawful fees for debt relief services as payments for *sham bankruptcy-related services* that consumers neither wanted nor needed.

42. To entice consumers to enroll into this unlawful debt relief scheme, Defendants marketed the program through television commercials, radio advertisements, and the internet.

50. Second, the Intake Specialists guided consumers through the enrollment process to ensure that they signed two contracts when enrolling in *the debt relief scheme: one for debt relief services and one for sham bankruptcy services*.

53.... The reason for the pressure was to ensure that Defendants and Morgan Drexen could create a pretext—*the sham bankruptcy services*—to *purportedly justify charging the consumer unlawful fees as part of the debt relief scheme.*

93. .... Therefore, Defendants' representations as described herein violate the TSR, 16 C.F.R. § 310.3(a)(2)(ii) and (x), and are *deceptive acts or practices* in telemarketing.

(O'Keefe Dec., Ex. A). Deception is a species of fraud and hence the heightened pleading requirement in Rule 9(b) applies.

To comply with the higher burden imposed by Rule 9(b), a plaintiff must set forth the particulars of the acts or omissions alleged, so the defendant has adequate notice of the purported wrong and can frame a defense. See Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir.1986); Denny v. Barber, 576 F.2d 465, 469 (2d Cir.1978). The "circumstances constituting fraud" are the facts telling when and where the alleged fraud took place, who was involved, the nature of the fraudulent action and how it was accomplished. Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549-50 (8th Cir.1997). Allegations of fraudulent misrepresentations "ought to specify ***the time, place, speaker, and content*** of the alleged misrepresentations." DiVittorio v. Equidyne Extractive Industries, Inc., 822 F.2d 1242, 1247 (2d Cir.1987). The Defendants would respectfully submit that the CFPB has not met, and cannot meet this specificity standard.

To plead a "substantial assistance" claim under the TSR, the CFPB was required to allege, with the requisite specificity, that 1) there was an underlying violation of the TSR; (2) the Defendants provided substantial assistance or support to the seller or telemarketer violating the TSR; and (3) the Defendants knew or consciously avoided knowing that the seller or telemarketer is violating the TSR. Fed. Trade Comm'n v.

17

1  <u>Lake</u>, 181 F. Supp. 3d 692, 700–01 (C.D. Cal. 2016). The precise TSR violation or

2  "deception" alleged in the Attorney Complaint boils down to this: *When the*

3  *Defendants solicited bankruptcy clients, and entered into bankruptcy retainer*

4  *agreements with such clients,* **they knew they were not going to perform the legal**

5  **services described therein***, but instead intended to use the "up front" payments*

6
7  *remitted pursuant to these contracts for debt settlement services, in violation of the*

8  *TSR.*[6] To state this claim in compliance with Rule 9(b), the CFPB must state that the

9  Defendants either a) never intended to provide the services described in the bankruptcy

10
11  retainer contracts, and cite the supportive specifics, see <u>Vess v. Ciba–Geigy Corp.</u>

12  <u>USA</u>, 317 F.3d 1097, 1106 (9th Cir.2003) (The plaintiff "must set forth what is false or

13
14  misleading about a statement, and why it is false."), or b) state that they only intended

15
16  to provide these services in "some" of these contracts.

17       The CFPB cannot make the first allegation in good faith – as in an allegation of

18  a total intent not to comply – since it is clear from the order granting terminating

19
20
21  _____

22  [6] The Defendants were fully entitled solicit and to receive up front retainers and/or fees for bankruptcy preparation and filing legal work. This is practice is fully contemplated

23  under the application provisions of the bankruptcy code and it is common practice. <u>See</u> 11 U.S.C. § 329; Fed. R. Bankr. P. 2016 and 2017; <u>see also</u> <u>Matter of Leitner</u>, 221 B.R.

24  502, 503 (Bankr. D. Neb. 1998) ("**Prudent counsel will not agree to pay the**

25  **bankruptcy filing fees and to file the bankruptcy case without a retainer**.") (emphasis added). Accordingly, if in fact the Defendants intended to provide the

26  services promised in the bankruptcy retainer agreements, then no violation of the TSR

27  occurred, since there was no "deception".

28

sanctions against Morgan Drexen that quite a few bankruptcy petitions were in fact prepared in the ordinary course.[7] This leaves the CFPB with the option of admitting that the alleged deception of contractual "false promise" occurred in some cases, but not others. *These allegations do not appear in the Attorney Complaint.* To walk down the latter path, which is the only one available, the CFPB must list the contracts at issue, and the grounds that support its allegations of promissory fraud. See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103–04 (9th Cir. 2003); see also Anderson v. Clow (In re Stac Elecs. Sec. Litig.), 89 F.3d 1399, 1404–05 (9th Cir.1996). Again, these mandatory allegations do not appear in the Attorney Complaint.

Although the CFPB will assert that it has satisfied its burden by alleging that *Morgan Drexen* never intended to provide the services described in the Bankruptcy Contracts, this argument fails. The Defendants paid Morgan Drexen to collect the data necessary to prepare bankruptcy petitions for the Defendants' bankruptcy clients, and to prepare a draft for each one. Once these petitions were prepared, the Defendants role, as legal counsel, was to review, edit and approve the final version of these documents. If, as the CFPB alleges, Morgan Drexen never intended to perform this service for the Defendants – again a service it was paid to do – this deception may give

---

[7] Although the total number is not clear, the order granting terminating sanctions acknowledges that petitions were in fact prepared (O'Keefe Dec., H), and the CFPB acknowledged in the Statement of Undisputed Facts that it filed in the MD Case that hundreds of bankruptcy cases had been filed.

rise to claim against Morgan Drexen. It does not state either a fraud or TSR claim against the Defendants.

To state a "substantial assistance" claim *against the Defendants* within this factual context, the CFPB would have to allege the following, with the requisite Rule 9(b) specificity: a) Morgan Drexen never intended to collect the bankruptcy data and prepare the first drafts of the client petitions as promised; b) the Defendants were aware of this fraudulent intent and purpose, and c) notwithstanding this knowledge, the Defendants agreed to pay Morgan Drexen for doing exactly nothing, and thereby "assisted" this fraudster in effecting a "deception" upon their own clients. Respectfully, these obligatory allegations do not appear in the Attorney Complaint.[8] Accordingly, it fails to state a claim.

**F.    Issue # 5: Judicial Estoppel**. Judicial estoppel is an equitable doctrine that bars a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking an inconsistent position. Rissetto v. Plumbers & Steamfitters Local, 94 F.3d 597, 600–601 (9th Cir.1996); Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir.1990). In the Ninth Circuit, the courts also employ judicial estoppel to vindicate "general consideration[s] of the orderly administration of justice

---

[8] Stated otherwise, the CFPB is conflating the separate contractual role played by the Defendants and Morgan Drexen in reference to the bankruptcy clients, into one, and conflating the separate "intent" allegations that must be made as to each, into one. ***Notably, in the MD Case, the CFPB did the exact opposite. It insisted that Morgan Drexen was the separate prime-mover and that Defendants were largely irrelevant munchkins.***

and regard for the dignity of judicial proceedings," and to "protect against a litigant playing fast and loose with the courts." <u>Russell</u>, 893 F.2d at 1037.

The Defendants would respectfully submit that it is difficult to conceive of a more appropriate case for the application of judicial estoppel than this one, for the following reasons:

1.     The CFPB was fully advised of the relationship that existed between the Defendants and Morgan Drexen before it filed the exact same claims against Morgan Drexen that it has now asserted against the Defendants, and yet the CFPB intentionally excluded the Defendants from the MD Case, and in fact made a point of barring similarly situated attorneys from intervening in the MD Case to protect their rights;

2.     The CFPB alleged in every pleading filed in the MD Case that *Morgan Drexen* was the party who engaged in the activities chronicled in the Attorney Complaint, and the Defendants merely received payments for the nominal services they rendered (reviewing and approving settlements, etc.). (See Ex. "A" *attached to this Motion* contrasting past findings with the new allegations); and

3.     This Court adopted as true all of the allegations in the complaint filed in the MD Case in the Injunction, (O'Keefe Dec., Ex. F), and ruled that Morgan Drexen is 100% financially responsible these alleged wrongs. Yet, the CFPB now asserts that the Defendants engaged in these same wrongs and bears responsibility for the exact same damages imposed upon Morgan Drexen alone.

The Defendants would respectfully submit these facts clearly present a case of a litigant who is "playing fast and loose with the court." Hamilton v. State Farm Fire & Cas., 270 F.3d 778, 782 (9th Cir.2001) (judicial estoppel is invoked to "protect against a litigant playing fast and loose with the courts."). Respectfully, this abusive and inconsistent course of conduct should be barred.

**G.    Issue # 6: Issue Preclusion**.  The CFPB participated in the MD Case as the plaintiff, and consequently, unlike the Defendants, it is bound by the findings and rulings made therein. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 330, 99 S. Ct. 645, 651 (1979; Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1050 (9th Cir.2008). It cannot relitigate these resolved issues, or assert positions that are contrary thereto. Yet, a side-by-side comparison of the allegations made in this case to the findings made in the MD Case confirms that is exactly what the CFPB is attempting to do. (See, Ex. "A" hereto).

As Exhibit "A" hereto establishes, every finding made by this Court states that Morgan Drexen solicited the "Affected Consumers", made representations to these consumers, took money from these consumers, and enrolled these consumers in "Morgan Drexen's debt relief program." Moreover, the judgment rendered by this Court against Morgan Drexen at the CFPB's request was not for half of the assessed damages, but one hundred percent of these damages.

In stark contrast to this Court findings, the CFPB now states:

Under the debt relief program *that Howard and Williamson established*,

1   consumers would sign a contract for debt relief services with Howard
2   Law or The Williamson Law Firm. The debt relief contract required
    consumers to pay advance fees prior to the settlement of any debt.
3
4   (O'Keefe Dec, Ex. A, P. 000007, ¶ 33). Accordingly, "Morgan Drexen's debt relief
5   program" has now become Howard and Williamson's debt relief program. Where this
6   Court held that Morgan Drexen collected unlawful fees for Morgan Drexen's program,
7
8   now this course of conduct is attributed to the Defendants:
9       In fact, Defendants continued to charge consumers who sought debt relief
10      services an advance engagement fee of between $1,000 and $3,250 and a
        monthly "administrative" fee of $50 in connection with debt relief services—
11      they just moved every mention of these fees to the contract for bankruptcy-
        related services.
12
13  (O'Keefe Dec., Ex. A, P. 000009, ¶ 40). In the complaint filed in the MD Case[9], and
14
15  later in the CFPB's summary judgment motion, the CFPB stated that Walter Ledda and
16  Morgan Drexen designed the "dual program" and drafted the contracts:
17      In response, *Ledda devised* a model Morgan Drexen used to continue to
18      charge up-front fees for debt settlement services under the guise of
        providing "bankruptcy services" once the proposed rule became effective
19      UF 87-91. To implement this plan, Morgan Drexen revised the contract
20      structure of its debt settlement program so that consumers sign two
        contracts: one for debt settlement services, under which the consumer is not
21      charged an up-front fee, and one for bankruptcy-related services, under
22      which the consumer is charged an up-front engagement fee of between
        $1,000 and $3,250, and a monthly maintenance fee of $50.
23
24
25  [9] Paragraph 8 of the MD Complaint states: "In or around August 2007, *Morgan Drexen*
26  *began employing* what is known colloquially as the "Attorney Model" of debt relief services.
    Under the Attorney Model, consumers contracted directly with attorneys affiliated with
27  Morgan Drexen for the provision of debt relief services and paid the attorneys up-front fees
    in advance of any debt being settled. *Morgan Drexen, not the attorneys, actually performed*
28  *the debt relief work on behalf of consumers.*"

23

(O'Keefe Dec., Ex. E, P. 000081). Yet, in the CFPB's new complaint, the Defendants are alleged to have created the dual contract program:

> In short, this two-contract debt relief model **was designed by Howard, Williamson, Howard Law, and The Williamson Law Firm** to disguise consumers' payments of unlawful fees for debt relief services as payments for sham bankruptcy-related services that consumers neither wanted nor needed.

(O'Keefe Dec., Ex. A, P. 000009, ¶ 41).

The foregoing examples are merely illustrative of what is obvious when the findings in the MD Case are lined up side-by-side with the allegations made in the complaint filed in this case. (See Ex. A hereto). This comparative establishes that the findings made in the prior case clearly conflict with those that the CFPB is seeking to obtain in this case. This is barred. Having established that "A" is true, the CFPB is stuck with this finding. See, Eagle Foundation, Inc. v. Dole, 813 F.2d 798, 810 (7th Cir.1987) ("The principal is that if you prevail in Suit # 1 by representing that 'A' is true, you are stuck with 'A' in all later litigation growing out of the same events); see also Anaya v. Barrios, 2017 WL 345206, at 2 (E.D.CA 2017); Robi v. Five Platters, Inc., 838 F.2d 318, 322 (9th Cir. 1988).

**H.    Issue # 7: Statute of Limitations.** In the Complaint, the CFPB states that it is seeking relief for violation of the TSR that occurred between "2010 and the present." Since the CFPB's claims are subject to a three year statute of limitations, see

24

15 U.S.C. § 6102; 15 U.S.C. § 57(b)[10], all claims alleged that relate to actions predating January 29, 2014 are barred. Notably, the CFPB essentially conceded this defect at the hearing held on February 8, 2017.

## <u>Section III: Conclusion</u>

For the foregoing reasons, the Defendants would respectfully pray that the Court grant the motion.

DATED: March 30, 2017                O'KEEFE & ASSOCIATES
                                     LAW CORPORATION, P.C.

                                          /s/ Sean A. O'Keefe
                                     By: _____
                                          Sean A. O'Keefe, attorneys for
                                          the defendants

DATED: March 30, 2017                THE VANDERPOOL LAW FIRM

                                          /s/ Douglas B. Vanderpool
                                     By: _____
                                          Douglas B. Vanderpool,
                                          attorneys for the defendants

---

[10] 15 U.S.C.A. § 57b ("No action may be brought by the Commission under this section more than 3 years after the rule violation to which an action under subsection (a)(1) of this section relates, or the unfair or deceptive act or practice to which an action under subsection (a)(2) of this section relates....).

**EXHIBIT "A"**

| FINDINGS OR ALLEGATIONS MADE IN MD CASE | CONTRARY ALLEGATION IN ATTORNEY COMPLAINT |
|---|---|
| In 2009, Morgan Drexen learned that the FTC was considering amending the TSR to prohibit the receipt of up-front fees for debt settlement services. UF 80. At the time, Morgan Drexen derived approximately 50% of its revenue from the upfront fees consumers were charged for debt settlement services. UF 83. Morgan Drexen considered the TSR amendments' proposed ban on up-front fees for debt settlement services a threat to its business. UF 84.<br><br>(O'Keefe Dec., Ex. E, P. 000081).<br><br>In response, ***Ledda devised*** a model Morgan Drexen used to continue to charge up-front fees for debt settlement services under the guise of providing "bankruptcy services" once the proposed rule became effective UF 87-91. ***To implement this plan, Morgan Drexen revised the contract structure*** of its debt settlement program so that | In short, this two-contract debt relief model ***was designed by Howard, Williamson, Howard Law, and The Williamson Law Firm*** to disguise consumers' payments of unlawful fees for debt relief services as payments for sham bankruptcy-related services that consumers neither wanted nor needed.<br><br>(O'Keefe Dec., Ex. A, P. 000009, ¶ 41). |

| | |
|---|---|
| consumers sign two contracts: one for debt settlement services, under which the consumer is not charged an up-front fee, and one for bankruptcy-related services, under which the consumer is charged an up-front engagement fee of between $1,000 and $3,250, and a monthly maintenance fee of $50.<br><br>(O'Keefe Dec., Ex. E, P. 000081).<br><br>In numerous instances, Network Attorneys perform little, if any, work with respect to debt relief.<br><br>(O'Keefe Dec., Ex. D, P. 000062).<br><br>Among other acts relating to Morgan Drexen, Mr. Ledda manages the company's day-to-day operations, is the sole signatory on Morgan Drexen's bank accounts, and was instrumental in the creation of the Morgan Drexen's Dual Contract Model.<br><br>(O'Keefe Dec., Ex. D, P. 000065) | |
| Customers are required to sign separate contracts for the debt settlement services | In fact, Defendants (the attorneys) continued to charge consumers who |

| | |
|---|---|
| and bankruptcy services. **Under the debt settlement contract, the consumer pays no up-front fees.** Under the bankruptcy services contract, the consumer must pay an up-front engagement fee and a monthly maintenance fee. (O'Keefe Dec., Ex. H, P. 000200-201). | sought debt relief services an advance engagement fee of between $1,000 and $3,250 and a monthly "administrative" fee of $50 in connection with debt relief services—they just moved every mention of these fees to the contract for bankruptcy-related services.<br><br> (O'Keefe Dec., Ex. E, P. 000091) (insert added). |
| The uncontroverted evidence demonstrates that **Morgan Drexen requests and receives** impermissible up-front fees for debt settlement services<br><br>(O'Keefe Dec., Ex. E, P. 000091).<br><br>**Morgan Drexen requested or received** fees from consumers before renegotiating, settling, reducing, or otherwise altering the terms of at least one of such consumers' debts.<br><br>(O'Keefe Dec., Ex. F, P. 000106). | In fact, **Defendants** (the attorneys) continued to charge consumers who sought debt relief services an advance engagement fee of between $1,000 and $3,250 and a monthly "administrative" fee of $50 in connection with debt relief services—they just moved every mention of these fees to the contract for bankruptcy-related services.<br><br> (O'Keefe Dec., Ex. E, P. 000091) (insert added). |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Provided, however,* that to facilitate an orderly wind down **of Morgan Drexen's business operations** and ensure Affected Consumers in debt relief payment plans will be provided with the opportunity to continue making payments on those plans, **Morgan Drexen may continue to provide debt relief services** to Affected Consumers **for whom Morgan Drexen has negotiated a debt settlement** and who are currently engaged in a payment plan pursuant to that debt settlement for an additional 60 days from the entry of this Order. However, as of the date of this Order, Morgan Drexen may not collect any fees from these Affected Consumers.

(O'Keefe Dec., Ex. F, P. 000111).

As of the date of this Order, Morgan Drexen is permanently restrained and enjoined from collecting any advance fees from consumers who may enroll in any debt relief product or service provided by Morgan Drexen in the future.

1
2   B. As of the date of this Order, Morgan
3   Drexen is permanently restrained and
4   enjoined from collecting any further
5   fees from Affected Consumers.[11]
6
7   (O'Keefe Dec., Ex. F, P. 000111).
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22   [11] In the MD Case, this Court held that Morgan Drexen solicited, received and expended "upfront fees" for "debt settlement", and that Morgan Drexen was the party
23   performing this debt settlement work. These findings were based upon representations made by the CFPB. Now the CFPB is alleging that in fact it was the Defendants in
24   this action who engaged in these exact same actions. This is barred. See Rissetto v.
25   Plumbers & Steamfitters Local 343, 94 F.3d 597, 600 (9th Cir. 1996) ("Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent
26   positions, precludes a party from gaining an advantage by taking one position, and
27   then seeking a second advantage by taking an incompatible position.").
28

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am employed by the law office of Douglas B. Vanderpool in the County of Orange, State of California. I am over the age of 18 and not a party to the above-captioned action. My business address is 330 Main Street, Suite 203B, Seal Beach, Ca 90740.

On March 30, 2017 I served a copy of the attached documents entitled: **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT OR IN THE ALTERNATIVE FOR MORE DEFINITE STATEMENT** on the interested parties in this action as follows:

### See Attached Service List

[]      BY MAIL:      By placing a true and correct copy thereof enclosed in a sealed envelope addressed as above, with postage thereon fully prepared, in the U.S. Mail at Seal Beach, California. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal service on the same day with postage thereon fully prepaid at Seal Beach, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing as stated in the affidavit.

[XX]    BY ELECTRONIC MAIL:   I personally sent the attached document from my e-mail account, doug@vanderpool-law.com to the recipient's e-mail account set forth in the service list. I did not receive any electronic transmission or other message within a reasonable time that the delivery was unsuccessful.

[ ]      BY PERSONAL SERVICE:   I caused such envelope to be delivered by hand to the offices of the addressee(s).

[XX] **(Federal)**      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 30, 2017 at Seal Beach, California.

S// *Heather A. Tovar*
_____

Heather Tovar

1

**<u>SERVICE LIST</u>**

2

Cara Petersen

3

Jan Singelmann
Amy Radon

4

Consumer Financial Protection Bureau
1700 G Street

5

Washington DC 20552

6

Email:  kristin.bateman@cfpb.gov; shirley.chiu@cfpb.gov; nandan.joshi@cfpb.gov ;
gabriel.o'malley@cfpb.gov; amy.radon@cfpb.gov; jan.singelmann@cfpb.gov

7

8

Kent A. Kawakami
AUSA-Office of US Attorney-Civil Division

9

300 N. Los Angeles Street, Suite 7516
Los Angeles, CA 90012

10

Email: kent.kawakami@usdoj.gov

11

*Attorneys for Consumer Financial Protection Bureau*

12

13

Sean A. O'Keefe
O'Keefe and Associates Law Corporation

14

4675 MacArthur Court, Suite 550
Newport Beach, CA 92660

15

Email:  sokeefe@okeefelc.com

16

*Attorney for Howard Law, PC*

17

18

19

20

21

22

23

24

25

26

27

28