Sean A. O'Keefe, Esq. (SBN 122417)
OKEEFE & ASSOCIATES
LAW CORPORATION, P.C.
2 Park Plaza, Suite 650
Irvine, CA 92614
Tel.: 949.334.4135
Email: sokeefe@okeefelc.com

Douglas B. Vanderpool, Esq.  (SBN 162857)
Heather A. Tovar, Esq.  (SBN 237004)
THE VANDERPOOL LAW FIRM
330 Main Street, Suite 203B
Seal Beach, CA 90740
Tel:  562.431.6900; Fax: 714.276.0558
Email: doug@vanderpool-law.com;
heather@vanderpool-law.com

Attorneys for Howard Law, P.C.,
The Williamson Law Firm, LLC, Williamson &
Howard, LLP, Vincent D. Howard,
and Lawrence Williamson

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>　　　　　　　Plaintiff,<br><br>　　　v.<br><br>VINCENT HOWARD, LAWRENCE W. WILLIAMSON, HOWARD LAW, P.C., THE WILLIAMSON LAW FIRM, LLC, AND WILLIAMSON & HOWARD, LLP,<br><br>　　　　　　　Defendants. | Case No. 8:17-CV 00161<br><br><br>**REPLY TO OPPOSITION TO MOTION TO DISMISS COMPLAINT**<br><br>**HON. JOSEPHINE L. STATON**<br><br>**DATE: May 26, 2017**<br>**TIME: 1:30 P.M.**<br>**PLACE: Ctrm. 10A** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE CONTENTS

| Section | Title | Page |
|---------|-------|------|
| I | Reply To Opposition Re Constitutionality Issue | 1 |
| II | Reply To Opposition Re Compliance with F.R.C.P. 9(b) Issue | 5 |
| III | Reply To Opposition Re Attorney Exemption Issue | 9 |
| IV | Reply To Opposition Re Injunction Claim Issue | 16 |
| V | Reply To Opposition Re Judicial Estoppel Issue | 17 |
| VI | Reply To Opposition Re Issue Preclusion Issue | 18 |
| VII | Reply To Opposition Re Statute of Limitations Issue | 19 |
| VIII | Conclusion | 20 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE AUTHORITIES**

**Cases**

AM. Bar Assn. v. FTC,  430 F.3d 457 (D.C. Cir. 2005) ........................................ 14, 16

Am. Bar Ass'n v. F.T.C., 671 F. Supp. 2d 64, 75 (D.D.C. 2009), vacated and remanded, 636 F.3d 641 (D.C. Cir. 2011)…………………………………..………15

CFPB v. Frederick J. Hanna & Assocs., 114 F. Supp. 3d 1342 ................................. 15

City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) ............................................. 16

Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc., 60 F. Supp. 3d 1082, 1087 (C.D. Cal. 2014).......................................................................................................... 1

Cornelis v. B & J Smith Assocs. LLC, 2014 WL 1828891, at 7 (D. Ariz. 2014)........ 19

Dep't of Transp. v. Ass'n of Am. Railroads, ................................................................. 3

Dombrowski v. Pfister, 380 U.S. 479, 485 (1965) ..................................................... 16

Estate of Condon, 76 Cal.Rptr.2d 922, 65 Cal.App.4th 1138 (1998) ......................... 12

Graham v. Taubman, 610 F.2d 821 (9th Cir. 1979) ................................................... 19

Heintz v. Jenkins, 514 U.S. 291, 294, 115 S.Ct. 1489, 1490 (1995)........................... 16

Hsu v. OZ Optics Ltd., 211 F.R.D. 615, 620 (N.D. Cal. 2002)...................................... 8

Humphrey's Ex'r v. United States, 295 U.S. 602, 629, 55 S. Ct. 869, 874 (1935). 1, 2, 4

In re Agyekum, 225 B.R. 695, 702 (9th Cir. BAP 1998).............................................. 13

In re Anderson, 79 B.R. 482, 485 (Bankr.S.D.Cal.1987)............................................ 13

In re Boettcher, 262 B.R. 94 at 96 (Bankr. C.D.CA. 2004) ....................................... 12

In re Glad, 98 B.R. 976, 978 (9th Cir. BAP 1989) ..................................................... 12

In re McCarthy, 149 B.R. 162, 166 (Bankr.S.D.Cal.1992) ......................................... 13

In re Powell, 266 B.R. 450, 452 (Bankr.N.D.Cal.2001) ............................................. 12

Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980) ............................... 19

MacElvain v. United States, 2002 WL 31083659, at 3 (M.D. Ala. 2002)................... 16

New Hampshire v. Maine, 532 U.S. 742, 74849, 121 S.Ct. 1808 (2001)................... 18

Raymond v. Merrill Lynch, Pierce, Fenner & Smith, 1991 WL 520500, at 6 (C.D. Cal. 1991), aff'd sub nom., 988 F.2d 121 (9th Cir. 1993) ..................................................7

Taub v. Weber, 366 F.3d 966 (9th Cir.2004) ......................................................12

Taylor v. Sturgell, 553 U.S. 880, 892, 128 S. Ct. 2161, 2171 (2008) .........................18

U.S. ex rel. UNITE HERE v. Cintas Corp., 2008 WL 1767039, at 9 (N.D. Cal. 2008) 7

U.S. Med. Instruments, Inc. v. CFS N. Am., Inc., 2013 WL 6055387, at 6 (S.D. Cal. 2013) ....................................................................................................7, 8

United States v. Ballard, 12 F. Supp. 321, 325 (W.D. Ky. 1935) ...............................4

United States v. Motz, 652 F. Supp. 2d 284, 294 (E.D.N.Y. 2009) ............................20

**Statutes**

12 U.S.C. § 5512(b) ...............................................................................5, 6

12 U.S.C. § 5517(e) ...............................................................................9, 10

12 U.S.C. § 5517(e) (1) ..............................................................................12

12 U.S.C. § 5517(e)(1) ...............................................................................15

47 U.S.C. § 227 ........................................................................................16

**Rules**

16 C.F.R. 310…………………………………………………………………….5

Federal Rule of Civil Procedure 9(b)……………………………………….,,.5

**Other Authorities**

Conference Report on H.R. 4173, Dodd-Frank Wall Street Reform and Consumer Protection Act, 111th Cong. 156 Cong. Rec. 105, at E1347-E1349 (2010) ............11

Howard Law, P.C., Williamson & Howard, LLP, The Williamson Firm, LLC, Vincent Howard and Lawrence Williamson (collectively the "Defendants") hereby submit the following *Reply* to the *Opposition* filed by the Consumer Financial Protection Bureau (the "CFPB") to the Defendants' *Motion To Dismiss* (the "Motion") all claims alleged in that certain *Complaint for Permanent Injunction and Other Relief* (the "Complaint").

## I

## REPLY TO OPPOSITION TO CONSTITUTIONALITY ISSUE

In the Opposition, the CFPB contends that the Court need not consider the Defendants' constitutional arguments. This argument should be rejected. If in fact the CFPB is constitutionally unsound then, as a legal nullity, it lacks the power or standing to pursue the instant case. Moreover, the CFPB's constitutional viability is currently in contest before a number of other federal courts. It is wholly appropriate, and in fact necessary from a jurisdictional perspective, for this Court to also consider this issue in the fullest measure.

In the Opposition, the CFPB argues that this Court's ruling in Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc., 60 F. Supp. 3d 1082, 1087 (C.D. Cal. 2014) ("Consumer Financial") disposes of the Defendants' constitutional challenge. In Consumer Financial, this Court held that the CFPB was constitutionally structured in reliance upon Humphrey's Ex'r v. United States, 295 U.S. 602, 629, 55 S. Ct. 869, 874 (1935). To quote the ruling in the Consumer Financial case:

*Humphrey's Executor* is controlling in this case. Then as now, the FTC was empowered to prevent "unfair methods of competition in commerce." *Id.* at 620, 55 S.Ct. 869. In order to carry out this responsibility, the FTC had the power to investigate, adjudicate, and enforce the prohibition on unfair competition. *Id.* at 620–21, 55 S.Ct. 869. Despite these powers over commercial activity, the Court upheld a provision allowing for removal of commissioners only for "inefficiency, neglect of duty, or malfeasance." *Id.* at 619, 632, 55 S.Ct. 869. Similarly, here, the Director of the CFPB may be removed by the President "for inefficiency, neglect of duty, or malfeasance," 12 U.S.C. § 5491(c)(3), and the President therefore retains ample authority to assure the Director is competently leading the CFPB in its mission to enforce federal consumer financial laws.

60 F. Supp. at 1088.

The Defendants would respectfully disagree with the foregoing holding. In Humphrey's the court stated:

> The commission is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality. It is charged with the enforcement of no policy except the policy of the law. ***Its duties are neither political nor executive, but predominantly quasi judicial and quasi legislative***. Like the Interstate Commerce Commission, its members are called upon to exercise the trained judgment of a body of experts 'appointed by law and informed by experience.'

Humphrey's Ex'r v. United States, 295 U.S. 602, 624 (emphasis added). As the highlighted language indicates, the Humphrey's court did not consider the limitation upon the president's power to appoint and remove the commissioners to be constitutionally fatal due to the fact that they exercised quasi-judicial and quasi-legislative powers. This is made explicit in the following paragraph:

> We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named. The authority of Congress, in creating

2

> ***quasi legislative or quasi judicial agencies***, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal except for cause in the meantime. For it is quite [1]evident that one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will.

Humphrey's, 295 U.S. 602, 629.

The facts in this case are very different. Here, *all* of the CFPB's power is vested in *one man*, Director Cordray, 12 U.S.C. § 5512(b). By definition, where a single man or woman controls a federal agency, the power being exercixed is solely *executive*. Since the director of the CFPB cannot be removed at the will of the President, this structure deprives the President of the powers vested in this office by Article II of the Constitution

To the extent that the CFPB argues that Director Cordray has quasi-legislative powers, this argument fails. When a single man or woman is vested with the power to make the law and to execute the law, his or her power is purely executive. One cannot deliberate alone.

The Defendants would also submit that this concentration of power should be struck down because it violates the separation of powers concept that is the foundation

---

[1] Section 5512(b) states: "*The Director* may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof."

3

of Articles I, II and III of the constitution. As the Supreme Court stated in <u>Dep't of</u>

<u>Transp. v. Ass'n of Am. Railroads</u>:

> At the center of the Framers' dedication to the separation of powers was individual liberty. The Federalist No. 47, at 302 (J. Madison) (quoting Baron de Montesquieu for the proposition that " '[t]here can be no liberty where the **legislative and executive powers** are united in the same person, or body of magistrates' ").

135 S. Ct. 1225, 1245 (2015) (emphasis added); <u>see also</u> <u>Humphrey's</u>, 295 U.S. 602,

629–30. ("The fundamental necessity of maintaining each of the three general

departments of government entirely free from the control or coercive influence, direct

or indirect, of either of the others, has often been stressed and is hardly open to serious

question."); <u>United States v. Ballard</u>, 12 F. Supp. 321, 325 (W.D. Ky. 1935) ("The

fountain head of dictatorship is at the convergence of legislative power and executive

power.").

     The constitutional question posed by the CFPB's structure is whether an agency

that is controlled *by a single man* who exercises extraordinary executive power falls

with the exception identified in the <u>Humphrey's</u> case. The Defendants would

respectfully submit it does not.

     Attached hereto as Exhibit "A" is the most recent brief filed by the United

States Government in the ongoing litigation over the CFPB's constitutionality pending

before the Court of Appeals for the District of Columbia. In this brief, the government

makes essentially the same arguments the Defendants have made above.

**II**

**<u>REPLY TO OPPOSITION RE COMPLIANCE WITH FRCP 9(b) ISSUE</u>**

The CFPB's contention that the Complaint complies with the specificity requirement in Federal Rule of Civil Procedure 9(b) ignores the core missing elements: Allegations that identify the clients who were purportedly duped into signing up for bankruptcy services when in fact what was really being proferred were debt settlement services; who duped these clients; and when. Although the CFPB references victims and damages in the Complaint, *it has failed to specify the name of even one defrauded client, or to designate a single contractual relationship wherein the bait-and-switch deception alleged in the Complaint occurred.*

The CFPB apparently believes it can get away with this vague conjuration by simply referencing the purported wrongs attributed to Morgan Drexen in the case against that entity. This position is untenable. The CFPB is not seeking recourse against Morgan Drexen and none of the findings in that case can be imported into this case individually, or en masse.

As the Defendants stated in the Motion, the precise "deception" that the CFPB contends violated the Telephone Sales Rule ("TSR"), 16 C.F.R. § 310 et.seq., boils down to this:

> When the Defendants solicited clients, and entered into separate bankruptcy retainer agreements with such clients, **they knew they were not going to perform the legal services described therein**, but instead

5

intended to use the "up front" payments remitted pursuant to these contracts for debt settlement services, in violation of the TSR.[2]

(P.18, Motion). This is a promissory fraud allegation. Although the CFPB has attempted to plead this claim as a form of "mass tort", on behalf of an unspecified and unnamed body of clients, this is untenable. A promissory fraud claim, whether cloaked with a statutory overlay or not, is subject to Federal Rule of Civil Procedure 9(b)[3]. See Hsu v. OZ Optics Ltd., 211 F.R.D. 615, 620 (N.D. Cal. 2002) ("However,

---

[2] The Defendants were fully entitled solicit and to receive up front retainers and/or fees for bankruptcy preparation and filing legal work. This is practice is fully contemplated under the application provisions of the bankruptcy code and it is common practice. See 11 U.S.C. § 329; Fed. R. Bankr. P. 2016 and 2017; see also Matter of Leitner, 221 B.R. 502, 503 (Bankr. D. Neb. 1998) ("**Prudent counsel will not agree to pay the bankruptcy filing fees and to file the bankruptcy case without a retainer**.") (emphasis added). Accordingly, if in fact the Defendants intended to provided the services promised in the bankruptcy retainer agreements, then no violation of the TSR occurred, since there was no "deception".

[3] Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995) ("In a securities fraud action, a pleading is sufficient under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer." *Kaplan v. Rose*, 49 F.3d at 1370. This notice requirement is satisfied by allegations of the "time, place and nature of the alleged fraudulent activities." *Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir.1973). When a fraudulent statement is alleged, the "plaintiff must set forth what is false or misleading about [the] statement, and why it is false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir.1994) (en banc).[4] In other words, the plaintiff must "set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made.*" *Id.* at 1549 (emphasis in original). Thus *GlenFed* requires a plaintiff to plead evidentiary facts and the court to consider what inferences these facts will support—despite the pitfalls and inefficiencies of such an analysis at the pleading stage, *id.* at 1556 (Norris, J., concurring)—and whether they are sufficient to satisfy the specificity requirement of Rule 9(b) as interpreted by *GlenFed.*")

promissory fraud is not exempted from the strictures of Rule 9(b), and a plaintiff is required to plead "facts from which the Court can infer that the allegedly fraudulent statements were actually false when made."); U.S. ex rel. UNITE HERE v. Cintas Corp., 2008 WL 1767039, at 9 (N.D. Cal. 2008).

To state a claim, the CFPB must, at a minimum, specify the client, the contract, the promise in the contract that was false when made, and to whom it was made specifically. See U.S. ex rel. UNITE HERE v. Cintas Corp., As the court explained in UNITE HERE:

> The court finds that Cintas' motion must be GRANTED. Even as to the contracts for work performed in South San Francisco, Sacramento, Chartotte, Yakima, and Nampa, UNITE HERE has not alleged fraud with particularity as required by Rule 9(b). UNITE HERE still has not alleged, as to each specific contract, that Cintas submitted a specific false claim to the United States or falsely certified on a specific occasion that it had complied with the SCA with regard to a specific contract.

> At most, UNITE HERE has simply alleged that Cintas violated the SCA-which does not provide a sufficient basis for an FCA claim. "Violations of laws, rules, or regulations alone do not create a cause of action under the FCA," as "[i]t is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *Hopper,* 91 F.3d at 1266.

2008 WL 1767039, at 9 (N.D. Cal. 2008); see also Raymond v. Merrill Lynch, Pierce, Fenner & Smith, 1991 WL 520500, at 6 (C.D. Cal. 1991), aff'd sub nom. Raymond v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 988 F.2d 121 (9th Cir. 1993) ("The complaint fails to specify where and to whom the alleged misrepresentations were made."); U.S. Med. Instruments, Inc. v. CFS N. Am., Inc., 2013 WL 6055387, at 6

(S.D. Cal. Nov. 13, 2013) (finding that Rule 9(b) required plaintiff to specify

'to whom' the fraudulent statement was made "particularly given that an exact date

was not specified" in the pleadings); <u>U.S. Med. Instruments, Inc. v. CFS N. Am., Inc.</u>,

2013 WL 6055387, at 6 (S.D. Cal. 2013) (finding that Rule 9(b) required plaintiff to

specify 'to whom' the fraudulent statement was made "particularly given that an exact

date was not specified" in the pleadings).

      The CFPB's answer to the foregoing legal deficiency is the following:

> The Bureau's Complaint, however, alleges that Defendants provided substantial assistance to Morgan Drexen's and Ledda's acts and practices that violated both section 310.3(a) of the TSR, which prohibits *deceptive* acts and practices (the deceptive advertisements) and section 310.4 of the TSR, which prohibits *abusive* acts and practices (collecting or charging upfront fees for debt relief services).

(Opposition, P. 10). This statement puts the proverbial cart before the horse. To state a

claim under the TSR, the CFPB must first allege the "deceptive" act or practice that

purportedly violated this rule in a manner that complies with Federal Rule of Civil

Procedure 9(b). This rule requires the CFPB to identify *who* was deceived by the

alleged deception.

      Simply stating that every single member of an unspecified group of clients was

deceived is not sufficient. As explained in the Motion, each client relationship is

different, and the Defendants' performance within the context of each contractual

8

relationship varied with each client. Accordingly, a claim can only pleaded on an individual client-by-client basis.[4]

### III

### <u>REPLY TO OPPOSITION RE ATTORNEY EXEMPTION ISSUE</u>

In the Opposition, the CFPB presents the following rather superficial argument in response to the Defendants' contention that the claims alleged are barred by the practice of law exclusion in 12 U.S.C. § 5517(e):

> Paragraph (3) of section 5517(e) makes clear that the Bureau has authority to enforce the TSR against attorneys. Paragraph (3) provides: "Paragraph (1) shall not be construed so as to limit the authority of the Bureau with respect to an attorney, to the extent that such attorney *is otherwise* subject to any of the enumerated consumer financial laws or the authorities transferred under subtitle F or H."[8] Here, the Bureau has only brought claims against Defendants under the TSR.[9] The authority to enforce the TSR was transferred to the Bureau under subtitle H. And the TSR does not contain an exemption for attorneys.[11] Thus, the Bureau has the authority to enforce the TSR against attorneys, including these Defendants.

(Opposition, P. 3).

This argument is contrary to the statute's plain language, which is quoted below:

> **(e) Exclusion for practice of law**
> **(1) In general**

---

[4] For example, the CFPB clearly cannot allege a case of promissory fraud within the parameters of Federal Rule of Civil Procedure 11, where the Defendants performed the promised services under the bankruptcy retainer agreement and they were paid for these services as provided in the contract. Yet, that is exactly what they are purporting to do in the broad sweep in the complaint.

Except as provided under paragraph (2), the Bureau may not exercise *any* supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law.

**(2) Rule of construction**

Paragraph (1) shall not be construed so as to limit the exercise by the Bureau of any supervisory, enforcement, or other authority regarding the offering or provision of a consumer financial product or service described in any subparagraph of section 5481(5) of this title--

**(A)** that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or

**(B)** that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service.

**(3) Existing authority**

Paragraph (1) shall not be construed so as to limit the authority of the Bureau with respect to any attorney, to the extent that such attorney is otherwise subject to any of the enumerated consumer laws or the authorities transferred under subtitle F or H.

12 U.S.C. § 5517(e).

The general rule enunciated in Section (e)(1) is the CFPB cannot exercise "**any**" supervisory or enforcement authority with respect to "*an activity* engaged in by an attorney *as part* of the practice of law." 12 U.S.C. § 5517(e) (1). The narrow clarification in subparagraph (3) of Section 5517(e) cited by the CFPB is merely intended to make it clear that an attorney who is engaging in an "activity" *that is not "part of the practice of law"* can be regulated as to that "other" activity under any other applicable consumer law.

The word "otherwise" in subparagraph (3) of Section 5517(e)(3) is the guidepost. This word means "in other respects", or "in different circumstances", as

defined in Merriam Webster Dictionary." The interplay between the general rule in subparagraph (1) and subparagraph (3) of Section 5517(e) becomes clear when these synonyms are inserted in the place of the world "otherwise":

> Paragraph (1) shall not be construed so as to limit the authority of the Bureau with respect to any attorney, to the extent that such attorney is ***in other respects (as in respects outside the "practice of law)*** subject to any of the enumerated consumer laws or the authorities transferred under subtitle F or H.

Again, subparagraph (3) of Section 5517(e) is merely stating that if an attorney engages in an activity that is not "part of the practice of law", he or she does not escape regulation by the CFPB under another consumer law simply by virtue of the individual's status as "an attorney."

The part of the Congressional Record cited by the CFPB in the Opposition actually makes exactly the foregoing point:

> At the same time, the Committee worked to clarify that this protection for the practice of law is not intended to preclude the new Bureau from regulating ***other conduct*** engaged in by individuals who happen to be attorneys or to be acting under their direction, ***if the conduct is not part of the practice of law or incidental to the practice of law*** . . . . Section 1027(e)(3) makes clear that existing federal regulatory authority over activities of attorneys, *either under enumerated consumer laws as defined in the bill, or transferred to the new Bureau from existing agencies under subtitle F or H of Title X*, the Consumer Financial Protection Bureau title, is not diminished.19 (Emphasis added.)

(P. 6, Opposition) (emphasis added); <u>Conference Report on H.R. 4173, Dodd-Frank Wall Street Reform and Consumer Protection Act</u>, 111th Cong. 156 Cong. Rec. 105, at E1347-E1349 (2010) (statement of Hon. John Conyers, Jr., Chairman, H. Judiciary

Comm.). This quote from Representative Conyers is dispositive. It states that the intent of Section 5517(e) is to allow the CFPB to supervise and regulate activity engaged in by attorneys that "is ***not*** part of the practice of law or incidental to the practice of law."

The CFPB's fall back position, to wit, the Defendants were not engaged in the practice of law, is untenable. The threshold for what constitutes the practice of law in California is a modest one. "Practicing law" includes, but is not limited to appearing in court; providing legal advice and counsel; and preparing legal instruments and contracts that secure a parties' legal rights. See Estate of Condon, 76 Cal.Rptr.2d 922, 65 Cal.App.4th 1138 (1998).

Notably, almost any aspect of the services provided in a debt "workout" context will be deemed the practice of law in California. In In re Glad, 98 B.R. 976, 978 (9th Cir. BAP 1989), the court held that a nonattorney engaged in the practice of law by "interview[ing] and solicit[ing] information from the debtor with regard to his financial status" and "assist [ing] the debtor in preparation of the bankruptcy schedules."[9] In In re Powell, 266 B.R. 450, 452 (Bankr.N.D.Cal.2001), the court noted that "[a] non-lawyer engages in the unauthorized practice of law when he or she determines for a party the kind of legal document necessary in order to effect the party's purpose." See also In re Boettcher, 262 B.R. at 96 (holding that it was the unauthorized practice of law for a bankruptcy petition preparer to prepare a "fill in the blank" motions to dismiss for a continuance for the debtor).[10] Interpreting legal terms

constitutes the practice of law. For example, in <u>Taub v. Weber</u>, 366 F.3d 966 (9th Cir.2004)[11] the court held that a bankruptcy petition preparer engaged in the unauthorized practice of law when he interpreted the terms "market value" and "secured claim or exemption" in connection with the preparation of bankruptcy forms. <u>Id.</u> at 971; <u>see also</u> <u>In re Agyekum</u>, 225 B.R. 695, 702 (9th Cir. BAP 1998) (holding that bankruptcy petition preparer use of a bankruptcy handbook which provided information about the bankruptcy process, information on what to consider when filing bankruptcy and a glossary of bankruptcy terms constituted the unauthorized practice of law). "Soliciting information from a debtor [by use of a questionnaire] which is then typed into schedules constitutes the unauthorized practice of law." <u>Agyekum</u>, 225 B.R. at 702; <u>see also</u> <u>In re McCarthy</u>, 149 B.R. 162, 166 (Bankr.S.D.Cal.1992); <u>In re Anderson</u>, 79 B.R. 482, 485 (Bankr.S.D.Cal.1987) (paralegal interviewed debtor, solicited information, prepared bankruptcy schedules, advised the debtor of her legal rights vis-a-vis secured collateral and the differences between a Chapter 13 and a Chapter 7 filing, advised the debtor on the necessity to file amendments to her schedules to reflect a tax refund, and selected her exemptions).

A review of the allegations in the Complaint confirms that the acts ascribed to the Defendants therein, which include renegotiating, settling, reducing, or otherwise altering the terms of a consumer debt, are "a part of the practice of law" in California. Accordingly, pursuant to 12 U.S.C. § 5517(e)(1) the CFPB is barred from supervising these activities, or pursuing any enforcement action with respect thereto.

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Although the CFPB states that its complaint survives because it alleges that clients were duped into signing a bankruptcy retainer when in fact what was being proferred were "debt settlement" services, this argument fails.[5] Whether the services being proferred were "workout" services or "bankruptcy services", they constituted "a part of the practice of law" in the state of California. Accordingly, they are not subject to regulation by the CFPB.

The CFPB's commentary on the <u>Am. Bar Assn. v. FTC</u>, 430 F.3d 457 (D.C. Cir. 2005) case is neither persuasive nor on point.  The issue is not whether the TSR (which is an FTC promulgated rule, not a statute) contains an attorney exemption, *but whether Congress explicitly expressed an intention to regulate attorneys in the statute pursuant to which this rule was issued* - the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101-6108. A rule passed by the FTC stating that the FTC has the power to regulate the practice of law does not make it so. As the court

---

[5] P. 5, Opposition: "The Bureau's Complaint specifically alleges that Defendants did not offer their debt relief services as part of any legitimate practice of law. The Complaint alleges that Defendants charged consumers upfront fees for debt relief services under the guise of "sham bankruptcy-related services that consumers neither wanted nor needed."13 In support of this allegation, the Complaint discusses the findings in the *Morgan Drexen* litigation that Morgan Drexen manufactured fake bankruptcy petitions to create the false impression that bankruptcy work had been performed for consumers.14 The Complaint further alleges that one of the defendants in this case, Williamson & Howard, LLP, worked hand-in-hand with Morgan Drexen to manufacture these fake bankruptcy petitions."

stated in <u>Am. Bar. Assn.</u> case, only Congress has the power to pass legislation effectuating such an astounding change to two centuries of precedent to the contrary, and the courts will not import such an intent into the statute. To the contrary, this intent must "unmistakenly" appear in the text before this interpretation is compelled.[6] <u>Am. Bar Ass'n v. F.T.C.</u>, 430 F.3d 457, 471–72 ("

The case of <u>CFPB v. Frederick J. Hanna & Assocs.</u>, 114 F. Supp. 3d 1342 (N.D. Ga. 2015) is also inapposite. In the <u>Hanna</u> case, the defendant was a debt collector, and the issue was whether or not the Fair Debt Collection Practices Act governed debt collection efforts by attorneys, and it clearly did.[7] In this case, the

---

[6] <u>Am. Bar Ass'n v. F.T.C.</u>, 430 F.3d 457, 471–72 ("It is undisputed that the regulation of the practice of law is traditionally the province of the states. Federal law "may not be interpreted to reach into areas of State sovereignty ***unless the language of the federal law compels the intrusion***." *City of Abilene v. FCC,* 164 F.3d 49, 52 (D.C.Cir.1999). Otherwise put, "if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' ***it must make its intention to do so 'unmistakably ***383 *472 clear in the language of the statute***.' " *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (quoting *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)).") (emphasis added).

[7] Although a prior version of the FDCPA "contained an express exemption for lawyers," which stated that "the term 'debt collector' did not include 'any attorney-at-law collecting a debt as an attorney on behalf of and in the name of a client.'" <u>Id.</u> (quoting Pub.L. No. 95–109, § 803(6)(F), 91 Stat. 874, 875 (1977)), Congress later "repealed this exemption in its entirety, without creating a narrower, litigation-related, exemption to fill the void." <u>Heintz v. Jenkins</u>, 514 U.S. 291, 294, 115 S.Ct. 1489, 1490 (1995). Based upon this prior legislative course, the <u>Hanna</u> court concluded that Congress must have "intended that lawyers be subject to the Act whenever they meet the general 'debt collector' definition." <u>Id.</u> at 295, 115 S.Ct. at 1491.

legislative history of the CFPA confirms that Congress was specifically not authorizing the CFPB to regulate the practice of law. Nor is there any Congressional direction, in passing the TCPA, permitting the FTC to regulate the practice of law. Accordingly, this intent should not be read into this statute or into the TSR. Am. Bar Assn. v. F.T.C., 430 F.3d 457, 471–72; see also Am. Bar Assn. v. F.T.C., 671 F. Supp. 2d 64, 75 (D.D.C. 2009), vacated and remanded, 636 F.3d 641 (D.C. Cir. 2011) (Noting the key distinction between a "customer" as referenced in the consumer regulation statutes and a "client".).

## IV

## REPLY TO OPPOSITION RE INJUNCTION CLAIM

In the Opposition, the CFPB does not dispute the fact that it has not alleged that the Defendants are engaged in debt relief work. Nor does it dispute the Defendants' contention that no work of this kind has occurred for over a year. The CFPB simply argues that it has the right to seek an injunction because it is possible the Defendants may re-enter the debt settlement business in the future.

With all due respect to the CFPB's perception of its own rights and powers, the issue is whether a "case or controversy" exists. Unless and until the CFPB alleges that an *ongoing wrong* exists that justifies judicial intervention in the form of an injunction, this Court has no power to entertain a demand for an injunction. See City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983); Dombrowski v. Pfister, 380 U.S. 479, 485 (1965)(noting "injunctive relief looks to the future"); MacElvain v. United States, 2002

WL 31083659, at 3 (M.D. Ala. 2002)("To allege a case or controversy for purposes of Article III standing, a plaintiff who seeks injunctive relief cannot rely only on past exposure to illegal conduct to establish a present controversy regarding injunctive relief.  Instead, a plaintiff must allege that he faces a "real and immediate threat" that he "will again be wronged in a similar way.").

**V**

**<u>REPLY TO OPPOSITION RE JUDICIAL ESTOPPEL</u>**

In the Opposition, the CFPB contends that the Defendants' judicial estoppel arguments should be tested using the following factors: (1) is the party's later position "clearly inconsistent" with its earlier position; (2) has the party succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled"; and (3) would the party seeking to assert an inconsistent position derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

Addressing the first element, the CFPB states that there is nothing "clearly inconsistent" about the lawsuits the Bureau brought against Morgan Drexen and Walter Ledda and its lawsuit against these Defendants. That was not the argument in the Motion. In Exhibit A to the Motion, the Defendants identified the contradictions between the *specific allegations* made in the Complaint and the contrary findings made in Morgan Drexen case. Not one of these fact-by-fact comparisons is addressed in the

17

Motion. Instead, as with the Complaint itself, the CFPB has relied upon vague unsupported generalities. That is not a sufficient response.

In fact, as the analysis in the Motion establishes the allegations cited are "clearly inconsistent" with the cited findings made in the Morgan Drexen case. Accordingly, the first element is satisfied. The other elements are also satisfied on the facts. This court accepted contrary allegations in Morgan Drexen case to those presented in this case (see Exhibit A to Motion), and the CFPB is seeking to persuade this court to accept these new contrary positions in order to obtain an unfair advantage in its case against the Defendants.

## VI

## <u>REPLY TO OPPOSITION RE ISSUE PRECLUSION</u>

In the Opposition the CFPB contends that "issue preclusion" only applies to a party who litigated a fact in an earlier case and "lost." That is not the case. "Issue preclusion bars "successive litigation of an issue of fact or law actually litigated and *resolved* in a valid court determination essential to the prior judgment," even if the issue recurs in the context of a different claim." <u>Taylor v. Sturgell</u>, 553 U.S. 880, 892, 128 S. Ct. 2161, 2171 (2008) (emphasis added), citing <u>New Hampshire v. Maine</u>, 532 U.S. 742, 74849, 121 S.Ct. 1808 (2001). The issue is whether the fact was "resolved", not who was the winner or the loser in the contest over the point in dispute.

It is true that most issue preclusion cases involve parties seeking to run away from adverse or "lost" factual findings. However, that is only true because few parties

1   are brazen enough to endeavor to run away from a fact that they established in another

2   case, but which is an inconvenience in a second case.

3

4       The analogy that fits the facts of this case is one where a plaintiff who obtained

5   a fraud ruling assigning 100% the fault and damages to John Smith, files a second

6   action seeking to assign 100% of the fault and damages to Stan Jones for the same

7   fraud. This course of conduct, which is in play in this case, is barred.

8

9                                       **VII**

10

11  **REPLY TO OPPOSITION RE STATUTE OF LIMITATIONS**

12      A claim should be dismissed if the statute of limitations bar is apparent from the

13  face of the Complaint. Graham v. Taubman, 610 F.2d 821 (9th Cir. 1979); Jablon v.

14  Dean Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980). Although the CFPB does not

15  dispute this legal position in the Opposition, it seeks shelter under the corollary to this

16  position, to wit, a unless it appears beyond doubt that the plaintiff can prove no set of

17  facts that would establish the timeliness of the claim, the claim should not be

18  dismissed, citing Cornelis v. B & J Smith Assocs. LLC, 2014 WL 1828891, at 7 (D.

19  Ariz. 2014). The Cornelis case and others like it apply in circumstances where the first

20  rule cited above (apparent on the fact of the complaint) does not apply, or where the

21  plaintiff can make a tolling or "date of discovery" extension argument. Neither

22  circumstance applies here.

23      *In this case, the CFPB acknowledges in paragraph 59 of the Complaint that it*

24  *filed the complaint against Morgan Drexen on August 20, 2013.* Accordingly, no

25

26

27

28

tolling or date of discovery arguments apply. The three- year statute of limitations bars, at the very least, all claims that arose prior to January 20, 2014. Arguably it bars all claims, because the CFPB is alleging a fraudulent "enterprise." Since this enterprise was known, and engaged in the purported wrongdoing at issue more than three years prior to the date the Complaint was filed (per the admission in paragraph 59), all of the CFPB's claims should be deemed time-barred. See United States v. Motz, 652 F. Supp. 2d 284, 294 (E.D.N.Y. 2009) (holding that ''[t]he fact that [defendant] is charged with repeatedly violating the statute over a period of time pursuant to the same scheme does not transform [securities fraud] into a 'continuing offense' for statute of limitations purposes'').

## VIII

## <u>CONCLUSION</u>

The Defendants would respectfully submit that the Complaint should be dismissed for the reasons stated in the Motion.

DATED: May 19, 2017           OKEEFE & ASSOCIATES
                                     LAW CORPORATION, P.C.

                                     /s/ Sean A. O'Keefe
                           By: _____
                                     Sean A. O'Keefe, attorneys for
                                     the defendants

DATED: May 19, 2017           THE VANDERPOOL LAW FIRM

                                     /s/ Doug Vanderpool
                           By: _____
                                     Doug Vanderpool, attorneys for
                                     the defendants

**EXHIBIT "A"**

[EN BANC ORAL ARGUMENT SCHEDULED FOR MAY 24, 2017]

**No. 15-1177**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

PHH CORPORATION, et al.,
Petitioners,

v.

CONSUMER FINANCIAL PROTECTION BUREAU,
Respondent.

_____

ON PETITION FOR REVIEW OF AN ORDER OF THE
CONSUMER FINANCIAL PROTECTION BUREAU

_____

**BRIEF FOR THE UNITED STATES
AS AMICUS CURIAE**

_____

CHAD A. READLER
  _Acting Assistant Attorney General_

DOUGLAS N. LETTER
MARK B. STERN
DANIEL TENNY
TARA S. MORRISSEY
  _Attorneys, Appellate Staff_
  _Civil Division, Room 7215_
  _U.S. Department of Justice_
  _950 Pennsylvania Ave., N.W._
  _Washington, D.C. 20530_
  _(202) 514-1838_

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Except for the following, all parties, intervenors, and amici appearing in this Court are listed in the Opening En Banc Brief for Petitioners.

After this Court granted rehearing en banc, the following newly appeared as amici before this Court:  The Cato Institute, RD Legal Funding, LLC, RD Legal Finance, LLC; RD Legal Partners, LP, Roni Dersovitz, and the States of Missouri, Alabama, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Louisiana, Nevada, Oklahoma, South Carolina, South Dakota, Texas, West Virginia, and Wisconsin.

The following have filed a notice of intent to participate as amicus: The Attorneys General of the States of Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Mississippi, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont and Washington, and the District of Columbia.

### B.    Ruling Under Review

This is a petition for review of a Final Order in *In the Matter of PHH Corporation*, Docket No. 2014-CFPB-0002 (June 4, 2015) [JA 1].  The Bureau's decision is unreported.

### C.    Related Cases

Counsel are unaware of any related cases within the meaning of Rule 28(a)(1)(C).

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION AND SUMMARY ........................................................................ 1

STATEMENT ............................................................................................................. 3

ARGUMENT ............................................................................................................. 5

I.     *Humphrey's Executor* Upheld Removal Restrictions For Members Of Multi-Headed Commissions And Should Not Be Extended By This Court To The CFPB, Which Is Headed By A Single Director......... 5

     A.     Under the Constitution and Supreme Court precedent, the general rule is that the President must have authority to remove Executive Branch agency heads at will .............................. 5

     B.     *Humphrey's Executor* created an exception to the general rule only for multi-member regulatory commissions............................. 8

     C.     *Humphrey's Executor* should not be extended to the CFPB ........... 12

II.     The Panel Correctly Concluded That The For-Cause Removal Provision Is Severable From The Remainder Of The CFPB Statutory Scheme ........................................................................................ 19

III.     The Court Has Discretion To Reach The Constitutionality Of The Bureau's For-Cause Removal Provision, And May Appropriately Do So Here .......................................................................... 22

IV.     The Court's Decision In *Lucia* Should Not Affect The Disposition Of This Case ............................................................................ 22

CONCLUSION ........................................................................................................ 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*Alaska Airlines, Inc. v. Brock,*
    480 U.S. 678 (1987) ................................................................................ 21

*Ayotte v. Planned Parenthood of N. New Eng.,*
    546 U.S. 320 (2006) ................................................................................ 20

*Bowsher v. Synar,*
    478 U.S. 714 (1986) .................................................................................. 6

*Clinton v. Jones,*
    520 U.S. 681 (1997) ................................................................................ 13

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) ............................................. 6, 7, 8, 9, 14, 16, 17, 20, 21

*Ex parte Hennen,*
    38 U.S. (13 Pet.) 230 (1839) ...................................................................... 7

*Humphrey's Executor v. United States,*
    295 U.S. 602 (1935) ....................................................... 1, 2, 3, 5, 8, 9, 12, 16

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
    684 F.3d 1332 (D.C. Cir. 2012) ........................................................... 20, 21

*Lucia v. SEC,*
    832 F.3d 277 (D.C. Cir. 2016) ................................................................ 22

*Morrison v. Olson,*
    487 U.S. 654 (1988) ...................................................................... 8, 10, 14, 16

*Myers v. United States,*
    272 U.S. 52 (1926) ............................................................................. 5, 6, 7

*NLRB v. Noel Canning,*
    134 S. Ct. 2550 (2014) ............................................................................ 16

*Northwest Austin Mun. Util. Dist. No. One v. Holder,*
    557 U.S. 193 (2009) ................................................................................ 22

*The Pocket Veto Case,*
 279 U.S. 655 (1929) ........................................................................................ 16

*Printz v. United States,*
 521 U.S. 898 (1997) ........................................................................................ 13

*Wiener v. United States,*
 357 U.S. 349 (1958) .......................................................................................... 9


## U.S. Constitution:

Art. II, § 1, cl. 1 ................................................................................................ 5

Art. II, § 2, cl. 2 ................................................................................................ 6

Art. II, § 3 ........................................................................................................ 5


## Statutes:

Act of Mar. 2, 1889, ch. 382, § 6, 25 Stat. 855, 861-62 ................................ 11

Interstate Commerce Act, ch. 104, § 11, 24 Stat. 379, 383 (1887) ............... 11

12 U.S.C. § 4502(20) ...................................................................................... 18

12 U.S.C. § 5302 ............................................................................................ 21

12 U.S.C. § 5481(6) ........................................................................................ 19

12 U.S.C. § 5491(b) .......................................................................................... 1

12 U.S.C. § 5491(c)(1) ...................................................................................... 1

12 U.S.C. § 5491(c)(3) ...................................................................................... 1

12 U.S.C. § 5511(a) ........................................................................................... 3

12 U.S.C. § 5511(c) ........................................................................................... 3

12 U.S.C. § 5531 ............................................................................................... 4

12 U.S.C. § 5562 ............................................................................................... 3

iv

12 U.S.C. § 5563 ............................................................................................ 3

12 U.S.C. § 5564(b) ...................................................................................... 4, 5

12 U.S.C. § 5565 ............................................................................................ 3

12 U.S.C. § 5581(b) ...................................................................................... 1, 4

15 U.S.C. § 41 (1934) .................................................................................... 8, 9

42 U.S.C. § 902(a) ....................................................................................... 18


**Rule:**

Fed. R. App. P. 29(a) ................................................................................... 1


**Legislative Material:**

1 Annals of Cong. 463 (Joseph Gales ed., 1834) ......................................... 6

51 Cong. Rec. 10, 376 (1914) ..................................................................... 11

S. Comm. on Governmental Affairs, *Study on Federal Regulation*,
    S. Doc. No. 95-91, vol. 5 (1977) ..........................................................10, 11


**Other Authorities**

Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies
    (and Executive Agencies)*, 98 Cornell L. Rev. 769 (2013) .................. 12

Kenneth Culp Davis, *Administrative Law of the Seventies* (1976) ......................... 12

*The Federalist No. 70* (J. Cooke ed., 1961) (Hamilton) ...................................6, 8

Letter from James Madison to Thomas Jefferson (June 30, 1789),
    16 *Documentary History of the First Federal Congress* 893 (2004) ......................... 7

Mem. Op. for the Gen. Counsel, Civil Serv. Comm'n,
  2 Op. O.L.C. 120 (1978) ................................................................................ 17

Memorandum of Disapproval on a Bill Concerning
  Whistleblower Protection, 2 Pub. Papers 1391 (Oct. 26, 1988).................................. 17

Statement on Signing the Social Security Independence and Program
  Improvements Act of 1994, 2 Pub. Papers 1471 (Aug. 15, 1994) ........................... 18

3 Joseph Story, *Commentaries on the Constitution of the United States* (1833) ...................... 13

## GLOSSARY

| | |
|---|---|
| CFPB | Consumer Financial Protection Bureau |
| FHFA | Federal Housing Finance Agency |
| FTC | Federal Trade Commission |
| HUD | Department of Housing and Urban Development |

## INTRODUCTION AND SUMMARY

The United States respectfully submits this brief as amicus curiae pursuant to Federal Rule of Appellate Procedure 29(a), in order to address the issues posed by the Court in its order granting rehearing en banc.

In 2010, Congress created the Consumer Financial Protection Bureau (CFPB) as part of the Dodd-Frank Act, giving the CFPB authority to enforce U.S. consumer-protection laws that had previously been administered by seven different government agencies, as well as new provisions added by Dodd-Frank itself. *See* 12 U.S.C. § 5581(b). The CFPB is headed by a single Director who is appointed by the President, with the advice and consent of the Senate, for a term of five years, *id.* § 5491(b), (c)(1), and who may be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office," *id.* § 5491(c)(3).

The panel in this case held that this "for cause" removal provision violates the constitutional separation of powers. Op. 9-10. The panel explained—and neither party disputes—that, as a general matter, the President has "Article II authority to supervise, direct, and remove at will subordinate [principal] officers in the Executive Branch" in order to exercise his vested power and duty to faithfully execute the laws. Op. 4. The panel recognized as well that *Humphrey's Executor v. United States*, 295 U.S. 602, 629 (1935), established an exception to that rule, holding that Congress may "forbid [the] removal except for cause" of members of the Federal Trade

Commission (FTC)—a holding that has been understood to cover members of other multi-member regulatory commissions that share certain features and functions with the FTC.  Op. 4.

The principal constitutional question in this case is whether the exception to the President's removal authority recognized in *Humphrey's Executor* should be extended by this Court beyond multi-member regulatory commissions to an agency headed by a single Director.  While we do not agree with all of the reasoning in the panel's opinion, the United States agrees with the panel's conclusion that single-headed agencies are meaningfully different from the type of multi-member regulatory commission addressed in *Humphrey's Executor*.

The Supreme Court's analysis in *Humphrey's Executor* was premised on the nature of the FTC as a continuing deliberative body, composed of several members with staggered terms to maintain institutional expertise and promote a measure of stability that would not be immediately undermined by political vicissitudes.  A single-headed agency, of course, lacks those critical structural attributes that have been thought to justify "independent" status for multi-member regulatory commissions.  Moreover, because a single agency head is unchecked by the constraints of group decision-making among members appointed by different Presidents, there is a greater risk that an "independent" agency headed by a single person will engage in extreme departures from the President's executive policy.  And as the panel recognized, while

multi-member regulatory commissions sharing the characteristics of the FTC discussed in *Humphrey's Executor* have existed for over a century, limitations on the President's authority to remove a single agency head are a recent development to which the Executive Branch has consistently objected.

We therefore urge the Court to decline to extend the exception recognized in *Humphrey's Executor* in this case. In addition, in our view, the panel correctly applied severability principles and therefore properly struck down only the for-cause removal restrictions.

## STATEMENT

Congress created the CFPB in 2010, as part of the Dodd-Frank Act, directing the Bureau to "seek to implement and, where applicable, enforce Federal consumer financial law" in order to ensure that "all consumers have access to markets for consumer financial products and services" and that the markets for such products and services are "fair, transparent, and competitive." 12 U.S.C. § 5511(a). The CFPB has authority to regulate the consumer-finance industry, including loans, credit cards, and other financial products and services offered to consumers. It has power to prescribe rules implementing consumer-protection laws; to conduct investigations of market actors; and to enforce consumer-protection laws in administrative proceedings and in federal court, including through civil monetary penalties. *See, e.g.*, *id.* §§ 5511(c), 5562, 5563, 5565. Congress transferred to the CFPB the authority to exercise functions that

had previously been spread among seven different federal agencies. *Id.* § 5581(b). Although some of the powers transferred to the CFPB came from multi-member commissions whose members are not subject to removal at will by the President, functions at issue in this case were transferred from the Department of Housing and Urban Development (HUD), a Cabinet agency. The CFPB is also tasked with enforcing new statutory requirements related to consumer finance. *See, e.g.*, *id.* § 5531.

This case involves a petition for review of a CFPB order requiring PHH Corporation to pay $109 million in disgorgement. A panel of this Court vacated the order on several statutory and constitutional grounds.

The CFPB (acting through its own attorneys, *see* 12 U.S.C. § 5564(b)), sought rehearing. This Court invited the Solicitor General to respond to the rehearing petition. The brief of the United States supported rehearing en banc, and took issue with aspects of the panel's analysis. The brief did not take a position on the constitutionality of the CFPB's structure, but observed that the "conferral of broad policymaking and enforcement authority on a single person below the President, whom the President may not remove except for cause, . . . raises a significant constitutional question that the Supreme Court has not yet squarely confronted." U.S. Resp. Br. 2. The brief urged that the Court's analysis should focus on "preserving (or appropriately limiting) the powers and roles of each Branch," rather

4

than on a particular structure's "impact on individual liberty as a freestanding basis for finding a separation-of-powers violation."  *Id.* at 10, 12.[1]

This Court granted the petition for rehearing en banc, instructing the parties to address various specified issues.

## ARGUMENT

I.   *Humphrey's Executor* Upheld Removal Restrictions For Members Of Multi-Headed Commissions And Should Not Be Extended By This Court To The CFPB, Which Is Headed By A Single Director

### A.     Under the Constitution and Supreme Court precedent, the general rule is that the President must have authority to remove Executive Branch agency heads at will.

Article II of the Constitution provides that the "[t]he executive Power shall be vested" in the President, and that he shall "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 1, cl. 1; *id.* art. II, § 3.  These provisions reflect the Framers' intention to create a strong, unitary Executive.  *See Myers v. United States*, 272

---

[1]  The CFPB has authority to represent itself in federal district courts and courts of appeals, and typically does so.  12 U.S.C. § 5564(b).  In one case filed against several federal agencies and departments, however, the Department of Justice represented all government defendants, including the CFPB.  The government's district court briefs in that case argued that, based on the Supreme Court's decision in *Humphrey's Executor*, the CFPB's for-cause removal provision is consistent with the Constitution.  *See State National Bank of Big Spring v. Mnuchin*, No. 1:12-cv-1032 (D.D.C.).  After reviewing the panel's opinion here and further considering the issue, the Department has concluded that the better view is that the provision is unconstitutional.  The Department is working with the CFPB to substitute the CFPB's own attorneys in that litigation.

U.S. 52, 116 (1926); *see also The Federalist No. 70*, at 472-73 (J. Cooke ed., 1961) (Hamilton).  Of particular relevance here, "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws."  *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (quoting 1 Annals of Cong. 463 (1789) (Joseph Gales ed., 1834) (remarks of Madison)).  "[A]s part of his executive power," the President "select[s] those who [are] to act for him under his direction in the execution of the laws." *Myers*, 272 U.S. at 117; *see also* U.S. Const. art. II, § 2, cl. 2.  Just as the President's ability to "select[] . . . administrative officers is essential" to the exercise of "his executive power," so too is his ability to "remov[e] those for whom he cannot continue to be responsible."  *Myers*, 272 U.S. at 117; *see also Bowsher v. Synar*, 478 U.S. 714, 726 (1986) ("Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey." (quotation marks omitted)).

Accordingly, "[s]ince 1789, the Constitution has been understood to empower the President to keep [executive] officers accountable—by removing them from office, if necessary."  *Free Enterprise Fund*, 561 U.S. at 483.  Indeed, the First Congress—many of whose members took part in the Constitution's framing— extensively debated the President's removal authority when creating the Department of Foreign Affairs (which later became the Department of State).  "The view that

6

'prevailed' . . . was that the executive power included a power to oversee executive officers through removal; because that traditional power was not 'expressly taken away, it remained with the President.'" *Id.* at 492 (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), 16 *Documentary History of the First Federal Congress* 893 (2004)). This view "soon became the 'settled and well understood construction of the Constitution.'" *Id.* (quoting *Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 259 (1839)).

Affirming this established understanding, the Supreme Court held in *Myers* that the President's executive power necessarily includes "the exclusive power of removal." *Myers*, 272 U.S. at 122. "[T]o hold otherwise," the Court explained, "would make it impossible for the President . . . to take care that the laws be faithfully executed." *Id.* at 164. The Court thus invalidated a statutory provision that "denied . . . the President" the "unrestricted power of removal" of officers appointed by the President with the advice and consent of the Senate. *Id.* at 176; *see also id.* at 107.

In sum, as the Supreme Court recently reaffirmed, the President's executive power "includes, as a general matter, the authority to remove those who assist him in carrying out his duties" to faithfully execute the laws. *Free Enterprise Fund*, 561 U.S. at 513-14. "Without such power, the President could not be held fully accountable" for how executive power is exercised, and "[s]uch diffusion of authority 'would greatly

diminish the intended and necessary responsibility of the chief magistrate himself.'" *Id.* at 514 (quoting *The Federalist No. 70*, at 478).

Although the Supreme Court has upheld certain "limited restrictions" on the President's general removal power with respect to inferior officers, *Free Enterprise Fund*, 561 U.S. at 495, the Court has recognized only one such restriction with respect to principal officers who head agencies:  the exception recognized in *Humphrey's Executor*.  *See id.* at 492-95.  As demonstrated below, that exception does not apply to the CFPB's Director, and it should not be so extended.

### B. *Humphrey's Executor* created an exception to the general rule only for multi-member regulatory commissions.

In *Humphrey's Executor*, the Supreme Court upheld a provision of the Federal Trade Commission Act establishing that FTC commissioners could be removed only for "inefficiency, neglect of duty, or malfeasance in office."  *Humphrey's Executor*, 295 U.S. at 620 (quoting 15 U.S.C. § 41 (1934)).  The Court's conclusion rested on its view at the time that the FTC "cannot in any proper sense be characterized as an arm or an eye of the executive," but rather "acts in part quasi-legislatively and in part quasi-judicially."  *Humphrey's Executor*, 295 U.S. at 628.[2]

---

[2] Since that time, the Supreme Court has observed that "the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree."  *Morrison v. Olson*, 487 U.S. 654, 689 n.28 (1988).

8

That characterization of the FTC was based not only on its substantive functions, but also on its structural features as an "administrative body."  *See Humphrey's Executor*, 295 U.S. at 628.  The FTC had five members with staggered terms, and no more than three of them could be of the same political party.  *See id.* at 619-20.  The Court thus emphasized early in its opinion that the FTC was "called upon to exercise the trained judgment of a body of experts" and was "so arranged that the membership would not be subject to complete change at any one time."  *See id.* at 624.  Indeed, the direct relationship perceived between those structural features and the restriction on the President's removal power was underscored by the fact that they all were enacted in the same statutory section.  15 U.S.C. § 41 (1934), *quoted in Humphrey's Executor*, 295 U.S. at 620.

The holding in *Humphrey's Executor* has been understood to encompass other multi-member commissions with features and functions similar to those of the FTC.  *See, e.g.*, *Wiener v. United States*, 357 U.S. 349, 355-56 (1958) (holding that "[t]he philosophy of *Humphrey's Executor*" precludes at-will removal of members of the War Claims Commission, a three-member body that was charged with adjudicating war-related compensation claims); *see also Free Enterprise Fund*, 561 U.S. at 483 ("In *Humphrey's Executor*, we held that Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause." (citation omitted));

*Morrison v. Olson*, 487 U.S. 654, 724-25 (1988) (Scalia, J., dissenting) ("[R]emoval

restrictions have been generally regarded as lawful for so-called 'independent

regulatory agencies,' such as the Federal Trade Commission, the Interstate Commerce

Commission, and the Consumer Product Safety Commission, which engage

substantially in what has been called the 'quasi-legislative activity' of rulemaking . . . ."

(citations omitted)).

As the panel noted, it is "not merely accidental or coincidental" that the

"independent agencies" that were established and understood to be covered by

*Humphrey's Executor* have been "multi-member" bodies.  Op. 48.  Rather, it has been

generally recognized that the removal restriction is a concomitant of—indeed,

"inextricably bound together" with—a continuing deliberative body.  Op. 48-49

(citing various sources).  Thus, as an extensive study of independent agencies

conducted in 1977 by the Senate Committee on Governmental Affairs concluded,

"[t]he size of the commission, the length of the terms, and the fact that they do not all

lapse at one time are key elements of the independent structure."  S. Comm. on

Governmental Affairs, *Study on Federal Regulation*, S. Doc. No. 95-91, vol. 5, at 35

(1977).  These features, typically accompanied by a limitation on the President's

removal authority, were "the basic structural features which [had] marked every

independent regulatory commission, beginning with the" Interstate Commerce

Commission in the 1880s.  *Id.* at 36; *see also* Interstate Commerce Act, ch. 104, § 11, 24 Stat. 379, 383 (1887); Act of Mar. 2, 1889, ch. 382, § 6, 25 Stat. 855, 861-62.

The structure of multi-member agencies with staggered-term memberships was designed to promote long-term continuity and expertise, and that goal was thought to be furthered by restricting the President's power to remove the members of such agencies.  As the 1977 Senate study observed, "regulatory policies would tend to be more permanent and consistent to the extent that they were not identified with any particular administration or party," and "[a]brupt change would therefore be minimized."  *Study on Federal Regulation*, vol. 5, at 29-30; *see also* 51 Cong. Rec. 10,376 (1914) (contemplating that Federal Trade Commission "would have precedents and traditions and a continuous policy and would be free from the effect of . . . changing incumbency").

In addition, the structure of multi-member agencies was designed to facilitate deliberative group decision-making, and that goal too was thought to be furthered by removal restrictions.  In fact, the Senate study concluded that the "[c]hief" consideration in determining whether to create an independent commission, rather than a standard executive agency, "is the relative importance to be attached to group decision-making."  *Study on Federal Regulation*, vol. 5, at 79.  Similarly, Professor Kenneth Culp Davis expressed the view that independent commissions are created primarily because they exercise adjudicative functions, and that these bodies should

11

have multiple members "just as we want appellate courts to be made up of plural members, to protect against the idiosyncracies of a single individual."  Kenneth Culp Davis, *Administrative Law of the Seventies* 15 (1976); *see also* Op. 45 (noting that "unlike single-Director independent agencies, multi-member independent agencies 'can foster more deliberative decision making'" (quoting Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 794 (2013)).

### C.     *Humphrey's Executor* should not be extended to the CFPB.

**1.**  A single-headed independent agency is not covered by an essential aspect of the rationale underlying *Humphrey's Executor* and independent multi-member commissions.  The CFPB lacks the structural features that the Supreme Court relied upon in part when characterizing the FTC as a "quasi-legislative," "quasi-judicial" "administrative body."  *Humphrey's Executor*, 295 U.S. at 628.  A multi-member commission with staggered-term memberships is established as "a body of experts" that by its nature operates in an interactive and deliberative manner, and is "so arranged that the membership would not be subject to complete change at any one time."  *Id.* at 624.  Restricting the President's power to remove the members of such commissions is thus thought to facilitate deliberative group decision-making and promote an inherent institutional continuity.

12

An agency headed by a single officer has none of those attributes.  To the contrary, it embodies a quintessentially executive structure.  "The insistence of the Framers upon unity in the Federal Executive—to ensure both vigor and accountability—is well known."  *Printz v. United States*, 521 U.S. 898, 922 (1997); *see also Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring) (describing how the Founders "consciously decid[ed] to vest Executive authority in one person rather than several," in contrast with their vesting of legislative and judicial powers in multi-member bodies).  It has long been recognized that "[d]ecision, activity, secre[c]y, and d[i]spatch will generally characterise the proceedings of one man in a much more eminent degree[] than the proceedings of a greater number."  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1414, at 283 (1833).  The Constitution itself specifies the official who must exercise that sort of executive power:  the President, acting either personally or through subordinate officers who are accountable to him and whose actions he can control.  The principles animating the exception in *Humphrey's Executor* do not apply when Congress carves off a portion of that quintessentially executive power and vests it in a single principal officer below the President who is not subject to the President's control.

Insofar as the Supreme Court has retreated from its rationale in *Humphrey's Executor* in sustaining the FTC structure as "quasi-legislative" and "quasi-judicial," it is particularly significant that the CFPB does not possess the structural features that

13

characterized the FTC.  As the Court acknowledged in *Morrison*, "it is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree."  *Morrison*, 487 U.S. at 689 n.28.  Consequently, it is imperative that an executive agency still seeking to be characterized as "quasi-legislative" or "quasi-judicial" under *Humphrey's Executor* at least have a multi-member structure, with its attributes of a deliberative body designed to have accumulated and collective insights and expertise as well as inherent institutional continuity.  Indeed, given "[t]he difficulty of defining such categories of 'executive' or 'quasi-legislative' officials," *Morrison*, 487 U.S. at 689 n.28, extending the "limited" *Humphrey's Executor* exception for multi-member commissions to single agency heads could threaten to swallow the "general" rule of *Myers* and Article II.  *See Free Enterprise Fund*, 561 U.S. at 495, 513.[3]

**2.**  Moreover, a single-headed independent agency creates concerns regarding the dispersion of executive power that are greater than those created by a multi-member independent commission.  Although the President's removal authority is identical in the two cases, a single-headed independent agency presents a greater risk

---

[3] Although *Morrison* upheld a "good cause" removal restriction for an independent counsel who was a "purely executive" official, the Court reasoned that the President's duty to faithfully execute the laws was not impermissibly impaired because the prosecutor was "an inferior officer … with limited jurisdiction and tenure and lacking policymaking or significant administrative authority."  *Morrison*, 487 U.S. at 689-91.  That holding obviously does not apply to any principal officer who heads an executive agency, especially the CFPB Director.

14

than a multi-member independent commission of taking actions or adopting policies inconsistent with the President's executive policy.  That is so for two related reasons.

*First*, whereas a multi-headed commission generally must engage in at least some degree of deliberation and collaboration, which tend toward compromise, a single Director can decisively implement his own views and exercise discretion without these structural constraints.  *See* Op. 46.  It is for such reasons that the Framers adopted a strong, unitary Executive—headed by the President—rather than a weak, divided one.  Vesting such power in a single person not answerable to the President constitutes a stark departure from that framework.

*Second*, the difference in decision-making is reinforced by the difference in the timing and composition of appointments to the two types of agencies.  For a multi-headed commission with staggered terms, the President is generally assured to have an opportunity to appoint at least some of its members, and the bipartisan-membership requirement that is common for such commissions further increases the likelihood that at least some of the holdover members share the President's views.  *See* Op. 58. By contrast, where a single Director has a term greater than four years (as is true for the CFPB), a President may never get to appoint the Director.  *See id.*  An agency where a President lacks control over both back-end removal and front-end appointment represents a further departure from the constitutional design.

To be sure, the frequency with which the threat of extreme departures from the President's executive policy materializes will depend on the particular circumstances, but the "added" risk of such departures "makes a difference." *See Free Enterprise Fund*, 561 U.S. at 495. Whereas the interference with executive power was mitigated in *Morrison* by the independent counsel's limited authority, and mitigated in *Humphrey's Executor* by the FTC's multi-member nature, the CFPB's interference with executive power is exacerbated by both its single-headed nature and its wide-ranging policy making and enforcement authority over private conduct.

**3.** Furthermore, unlike multi-member independent commissions, single-headed independent agencies are a relatively novel innovation. In the separation-of-powers context, "the lack of historical precedent" for a new structure is "[p]erhaps the most telling indication of [a] severe constitutional problem." *Free Enterprise Fund*, 561 U.S. at 505; *see also NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) ("'[L]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions' regulating the relationship between Congress and the President." (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929))). In *Free Enterprise Fund*, for instance, because "historical practice had settled on one level of for-cause removal for a President to remove the head of an independent agency," Op. 42, the Court declined to extend *Humphrey's Executor* to a "novel structure": two layers of for-cause removal. *Free Enterprise Fund*, 561 U.S. at 496. The

Supreme Court has thus been reluctant to expand *Humphrey's Executor* to "new situation[s] not yet encountered by the Court." *Id.* at 483.

Here, as the panel explained, until relatively recently all independent agencies have been structured as multi-member commissions. Op. 27-35.  Congress has created agencies with a single head subject to for-cause removal on only three other occasions.

*First*, in 1978, Congress established the Office of Special Counsel as an entity with a single head subject to removal only for cause.  Op. 31.  Among other functions, the Office of Special Counsel can seek corrective action through the Merit Systems Protection Board for violations of federal civil service personnel principles. The Office of Legal Counsel opposed the for-cause removal provision, Mem. Op. for the Gen. Counsel, Civil Serv. Comm'n, 2 Op. O.L.C. 120 (1978), and President Reagan vetoed subsequent legislation regarding the Office of Special Counsel, citing "serious constitutional concerns" about the agency's independent status.  *See* Memorandum of Disapproval on a Bill Concerning Whistleblower Protection, 2 Pub. Papers 1391, 1392 (Oct. 26, 1988).  As the panel noted, moreover, the Office's "narrow jurisdiction" over "government employers and employees" provides no historical support for creating a very different single-headed independent agency exercising general regulatory and enforcement power over private parties operating in a large sector of the economy, such as the CFPB.  Op. 31-32.

*Second*, in 1994, Congress made the Social Security Administration a separate agency headed by a single Commissioner appointed for a term of six years and removable only for cause.  Op. 30; *see also* 42 U.S.C. § 902(a).  When appraising the bill, President Clinton issued a signing statement noting that "in the opinion of the Department of Justice, the provision that the President can remove the single Commissioner only for neglect of duty or malfeasance in office raises a significant constitutional question."  Statement on Signing the Social Security Independence and Program Improvements Act of 1994, 2 Pub. Papers 1471, 1472 (Aug. 15, 1994).  Moreover, as the panel recognized, the Social Security Administration overwhelmingly engages in "supervision of the adjudication of private claims for benefits," not in bringing enforcement actions against private citizens, which makes it an inapposite precedent for the CFPB.  Op. 30-31.

*Third*, the Federal Housing Finance Agency (FHFA), which Congress created during the 2008 financial crisis to oversee Fannie Mae and Freddie Mac, is also headed by a single Director subject to removal only for cause.  Op. 33.  We are not aware of any Executive Branch comment on its single-director structure at the time of enactment of that emergency legislation.  In any event, the FHFA is a safety and soundness regulator for specified government-sponsored enterprises, namely Fannie Mae and Freddie Mac—for which the agency has acted as conservator since its inception—as well as federal home loan banks.  *Compare* 12 U.S.C. § 4502(20)

(defining "regulated entit[ies]" within jurisdiction of FHFA), *with id.* § 5481(6)

(defining "covered person" regulated by the CFPB as "any person that engages in

offering or providing a consumer financial product or service").[4]

Thus, to date, the Supreme Court has sanctioned a limitation on the power to

remove principal officers of the United States only for members of multi-member

bodies.  Neither history nor precedent suggests that *Humphrey's Executor* should be

extended to the CFPB.

In sum, a removal restriction for the Director of the CFPB is an unwarranted

limitation on the President's executive power.  This Court should not extend the

exception established by the Supreme Court in *Humphrey's Executor* to undermine the

general constitutional rule that the President may remove principal officers at will.

## II.     The Panel Correctly Concluded That The For-Cause Removal Provision Is Severable From The Remainder Of The CFPB Statutory Scheme

The panel correctly concluded (Op. 65-69) that the proper remedy for the

constitutional violation is to sever the provision limiting the President's authority to

remove the CFPB's Director, not to declare the entire agency and its operations

unconstitutional.

---

[4] The panel in this case appropriately did not address the application of its ruling to other agencies not before the Court.

This conclusion follows directly from the Supreme Court's decision in *Free Enterprise Fund*, which applied the familiar principle that, when "'confronting a constitutional flaw in a statute,'" courts generally "'try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.'" *Free Enterprise Fund*, 561 U.S. at 508 (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006)).  Even though Congress had not enacted a severability clause, the Court there held unconstitutional only the removal restrictions pertaining to members of the Public Company Accounting Oversight Board, and went on to hold that the proper remedy was to invalidate the removal restrictions, leaving the board members removable at will.  *Id.* at 509.  The Court reasoned that the Sarbanes-Oxley Act would "remain[] fully operative as a law with these tenure restrictions excised," and that no evidence suggested that Congress "would have preferred no Board at all to a Board whose members are removable at will."  *Id.* (quotation marks omitted).

Similarly, in *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012), this Court held that copyright royalty judges, who are charged with setting royalty rates for digital transmissions of recorded music, were principal officers who had not been appointed by the President and confirmed by the Senate.  The Court held that the proper remedy was to invalidate only a provision that limited the Librarian of Congress's ability to remove the judges.  *Id.* at 1340-41.  The

20

Court concluded that this remedy "eliminates the Appointments Clause violation and minimizes any collateral damage." *Id.* at 1340.

Here, as in those cases, severing the removal restriction is the proper remedy. Absent the for-cause removal provision, the Dodd-Frank Act and its CFPB-related provisions will remain "fully operative." *Free Enterprise Fund*, 561 U.S. at 509. And, as in *Free Enterprise Fund,* there is no evidence that Congress would have preferred no Bureau at all to a Bureau whose Director was removable at will. *See id.* Citing one legislator's statement that Congress sought to create a "completely independent" agency, PHH Br. 30, PHH speculates that Congress would have preferred to have no agency at all in the absence of a for-cause removal provision. But Congress never expressed this sentiment, and the Dodd-Frank Act's severability clause underscores that Congress would not have intended this result. 12 U.S.C. § 5302; *see Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987) (noting that severability clause "creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision," and "unless there is strong evidence that Congress intended otherwise, the objectionable provision can be excised from the remainder of the statute"). While it may be possible to conceive of other ways to remedy the constitutional violation, "[s]uch editorial freedom . . . belongs to the Legislature, not the Judiciary." *Free Enterprise Fund*, 561 U.S. at 510.

## III.   The Court Has Discretion To Reach The Constitutionality Of The Bureau's For-Cause Removal Provision, And May Appropriately Do So Here

We previously noted (U.S. Resp. Br. 12-14) that this Court may avoid deciding the separation-of-powers question in light of the panel's ruling on the statutory issues, which were the focus of the panel-stage briefing. The United States takes no position on the statutory issues in this case, but in the event that the ultimate resolution of those issues results in vacatur of the CFPB's order, it is within this Court's discretion to avoid ruling on the constitutional question. *See Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009); *see also* Op. of Henderson, J., at 8. That said, as the case has now been set for plenary briefing and en banc argument on the separation-of-powers question, and as that question is likely to recur in pending and future cases, it would be appropriate for the Court to provide needed clarity by exercising its discretion to resolve the separation-of-powers issue now.

## IV.   The Court's Decision In *Lucia* Should Not Affect The Disposition Of This Case

This Court has granted rehearing en banc in *Lucia v. SEC,* 832 F.3d 277 (D.C. Cir. 2016), to consider whether administrative law judges of the Securities and Exchange Commission are officers of the United States within the meaning of the Appointments Clause. If the Court concludes that these administrative law judges are not officers, its holding will not affect the Court's treatment of the other issues in this case. If the Court reaches a different conclusion in *Lucia*, its decision need not bear

22

on the proper disposition of this case.  In addition to deciding the separation-of-powers question, the panel vacated the CFPB's order on due process and statutory grounds; a conclusion that the administrative law judge who heard PHH's case was unconstitutionally appointed could only provide an additional, independent ground for vacatur.  If the CFPB pursues sanctions against PHH in new proceedings on remand, such proceedings will, of course, need to be consistent with the outcome in *Lucia*.  That prospect should not affect this Court's determination whether to reach the separation-of-powers question at this time.

## CONCLUSION

For the foregoing reasons, the for-cause removal provision should be invalidated and severed from the remainder of the Dodd-Frank Act.

Respectfully submitted,

CHAD A. READLER
  *Acting Assistant Attorney General*

DOUGLAS N. LETTER
MARK B. STERN

  *s/ Daniel Tenny*
DANIEL TENNY
TARA S. MORRISSEY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*
  *(202) 514-1838*

MARCH 2017

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief satisfies the type-volume requirements of Rule

29(a)(5).  This brief contains 5,410 words.


_s/ Daniel Tenny_____
Daniel Tenny

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2017, I filed and served the foregoing with the Clerk of the Court by causing a copy to be electronically filed via the appellate CM/ECF system.  Participants in the case are registered CM/ECF users and will be served via the CM/ECF system.  I also caused 30 paper copies of the brief to be hand delivered to the Court.

*s/ Daniel Tenny*
Daniel Tenny